

THE BALL LAW FIRM, LLP
Byron T. Ball, SBN 150195
10866 Wilshire Blvd., Suite 1400
Los Angeles, CA 90024
Telephone: (310) 446-6148
Facsimile: (310) 441-5386
btb@balllawllp.com

FEDERMAN & SHERWOOD
William B. Federman
10205 N. Pennsylvania Ave.
Oklahoma City, OK 73120
Telephone: (405) 235-1560
Facsimile: (405) 239-2112
wbf@federmanlaw.com

*Attorneys for Plaintiff*

CV11-8973-JAK(PJWx)

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

BENJAMIN L. PADNOS,
Derivatively on Behalf of CHINA
EDUCATION ALLIANCE, INC.,

      Plaintiff,

      vs.

XIQUN YU, ZIBING PAN, SUSAN
LIU, CHANQING WANG, JAMES
HSU, LIANSHENG ZHANG, and
YIZHAO ZHANG,

      Defendants,

CHINA EDUCATION ALLIANCE,
INC., a North Carolina Corporation,

      Nominal Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**CIVIL ACTION NO.**

**JURY TRIAL DEMANDED**

1

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

By and through his undersigned counsel, Plaintiff Benjamin L. Padnos submits this Verified Shareholder Derivative Complaint.

### NATURE OF THE ACTION

1.      This is a shareholder derivative action brought for the benefit of Nominal Defendant China Education Alliance, Inc. ("CEU" or the "Company") against Defendants Xiqun Yu, Zibing Pan, Susan Liu, Chanqing Wang, James Hsu, Liansheng Zhang, and Yizhao Zhang, for violations of their fiduciary duties owed to CEU from March 15, 2008 through the present (the "Relevant Period").[1]

### SUMMARY AND OVERVIEW

2.      Defendant CEU is a North Carolina corporation headquartered in Harbin, China. CEU, through its wholly owned principal operating subsidiary Harbin Zhong He Li Da Education Technology, Inc. ("ZHLD"), purports to provide for-profit education services in Northeast China.

3.      At all relevant times, CEU had two business segments: online education that provided education material for sale through CEU's website; and on-site tutoring and education through CEU's training center in Harbin.  These two business segments purportedly accounted for approximately 89% (or $22.3

---

[1] Because Defendants have failed to take action to remedy the breaches of fiduciary duties that occurred from March 15, 2008 through December 7, 2010, the Relevant Period continues through this day instead of ceasing on December 6, 2010, the day before the public became aware of the wrongdoing at the Company.

million) and 99% (or $34.3 million) of CEU's total revenue for the fiscal years ended December 31, 2008 and 2009, respectively. The online segment represented 67% (or $16.7 million) and 60% (or $22.2 million) of total revenue for 2008 and 2009, respectively. The training center segment represented 22% (or $5.6 million) and 33% (or $12.1 million) of total revenue for 2008 and 2009, respectively.

4.     During the Relevant Period, CEU touted record results and growth.

5.     In truth, Defendants overstated CEU's revenue and profits by exponential proportions.

6.     CEU fraudulently maintained two sets of books: (1) An accurate set of financial statements filed with Chinese regulators because CEU and the Individual Defendants are subject to fines and serious criminal penalties in the People's Republic of China ("PRC") if the accounts are false, and (2) a second set of false financial statements filed with the United States Securities and Exchange Commission (the "SEC"), an entity that has no ability to enforce violations of U.S. criminal laws over the Defendants who are domiciled in PRC.

7.     According to ZHLD's filings with the SAIC, the regulatory body in the PRC that regulates and licenses PRC businesses, for the years ended December 31, 2008 and 2009, ZHLD (CEU's Online Segment) reported $616,643 and $700,000 in revenue, respectively. The SAIC filings of certain of CEU's other subsidiaries show zero or similarly small amounts for revenue.  However, ZHLD's

3

PRC financial records stand in stark contrast to their SEC filings, which ascribed $16.7 million and $22.2 million of revenue to ZHLD for those two fiscal years.

8. ZHLD's PRC tax filings are consistent with its SAIC filings and similarly show that its revenue was a tiny fraction of the revenue it reported in its SEC filings.

9. The fraud was first disclosed publicly to investors on November 29, 2010, when analyst firm Kerrisdale Capital published an extensive 28-page report detailing its findings that CEU's Online and Training Center business and revenue were grossly overstated and a fraud. This Report also linked a number of reports written by Kerrisdale's investigators in the PRC and linked four videos (collectively the "Kerrisdale Report" or the "Report"). The Kerrisdale Report and the documents linked therein are attached hereto as Exhibit 1 and are incorporated by reference herein.

10. The crux of the Kerrisdale Report was that CEU is "fabricating its SEC financial statements," CEU's revenue and profits are highly overstated in its SEC filings, and that CEU is "mostly a hoax." In support, the Report notes the following (among other things):

- ZHLD's (the Online Segment) SAIC filings for the years ended 2006, 2007, and 2008 show a fraction of the revenue that CEU reported in its SEC filings;

4

- CEU's principal website and other websites do not work as evidenced by three videos demonstrating Kerrisdale's attempts to actually purchase products from CEU's websites;

- CEU's websites receive a fraction of the internet traffic when compared to a competitor that is generating lower revenue and margins; and

- CEU's Training Center segment (22%-33% of fiscal 2008 and 2009 revenue) is a sham, because the 36,600 square foot training center facility is an empty building with no classrooms.

11. The Kerrisdale Report caused CEU's stock price to fall 33.5% to $2.93 per share on November 29, 2010 and an additional 7.9% on November 30, 2010 to $2.70 per share.

12. On December 7, 2010, CEU conducted a conference call, reading to investors prepared questions and answers in an attempt to address the Kerrisdale Report. Among other things:

a. CEU admitted that there were "severe discrepancies" between the SAIC filings and CEU's SEC filings.

b. CEU, without citing to any authority, chalked up the contradictions in its PRC and SEC filings to, among other things, unspecified differences in U.S. and PRC accounting rules, that these SAIC filings are

5

unimportant, and that SAIC filings are generally inaccurate in order to prevent competitors from gaining an advantage by reviewing them.

        c.      CEU added that documents filed with the State Administration of Taxation ("SAT") are more reliable than SAIC filings because SAT filings are audited and filing false SAT documents result in a penalty.

        d.      CEU also claimed that the website issues observed by Kerrisdale were the result of Kerrisdale's investigators attempting to access the websites through the United States, not in China.

        e.      CEU claimed that when Kerrisdale visited the training center facility in Harbin, it was being "remodeled" as it was an "older" facility.

    13.     Later that day, Kerrisdale issued a response, standing by the Report and stating that the website tests were in fact performed by persons in the PRC.

    14.    CEU's exculpatory statements during the December 7, 2010 conference call were plainly false.

        a.      Filing false SAIC filings in PRC will result in fines and the revocation of the entity's business license. Without a business license an entity cannot legally operate in the PRC nor even maintain a bank account;

6

b.      In addition to the SAIC filings, private investigators[2] obtained ZHLD's SAT filings and they are consistent with the SAIC filings for ZHLD showing CEU fabricated its revenue and profits;

c.      The unexplained differences between PRC and US accounting rules do not explain the vast differences between the numbers reported. Moreover, there is no material difference between PRC accounting principles and U.S. accounting principles for recording revenue from online retail sales and retail education services; and

d.      Private investigators conducted interviews of persons at the training center facility in Harbin and inspected the training center facility, and discovered: (1) CEU or ZHLD does not own or occupy the building; (2) the training center facility was not under renovation in 2010, and (3) the facility does not contain classrooms.

15.     The market did not believe CEU's December 7, 2010 response either, and CEU's stock fell an additional 28% on December 7, 2010.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332 in that the amount in controversy exceeds $75,000.00

---

[2] All references to "investigators" or "private investigators" (other than specific references to "Kerrisdale investigators") made herein shall refer to the investigators retained by plaintiffs' counsel in the related securities class action, *In re China Education Alliance, Inc. Securities Litigation*, No. 2:10-cv-09239-CAS-JCx.

exclusive of interest and costs and that Plaintiff is a citizen of California. None of the Defendants is a citizen of California.

17. Each Defendant has minimum contacts with the U.S. and California, as they have contracted in California and the U.S., or have frequently traveled here, on CEU business and otherwise, or have authorized acts and actions which have had a sufficient impact in the U.S. or on CEU's shareholders and investors residing here to justify the exercise of jurisdiction over them.

18. This action is not a collusive one designed to confer jurisdiction upon a court of the United States that it would not otherwise have.

19. Venue is proper in this district pursuant to 28 U.S.C. §1391(a) and 1401 because a substantial portion of transactions and wrongs complained of herein occurred in this district. Substantial acts in furtherance of the alleged breaches of fiduciary duties have occurred in this District. Many of the acts charged herein, including the preparation and/or dissemination of false and/or misleading information, occurred in substantial part in this District. Further, Defendants have received substantial compensation in this district by engaging in numerous activities in this District.

## PARTIES

20. Plaintiff Benjamin L. Padnos ("Plaintiff" or "Padnos") is, and was throughout the Relevant Period, a shareholder of CEU. Plaintiff is a resident of the state of California.

8

21.     Nominal Defendant CEU is a North Carolina corporation, headquartered in Harbin, in the Heilongjiang Province in Northeast China.

22.     Defendant Xiqun Yu ("Yu"), at all relevant times herein, was CEU's Chairman and Chief Executive Officer ("CEO").  Upon information and belief, Defendant Yu is a resident of the PRC.

23.     Defendant Zibing Pan ("Pan") was CEU's Chief Financial Officer ("CFO") beginning on August 20, 2009.  He suddenly resigned from his position as CFO on February 28, 2011.  Upon information and belief, Defendant Pan is a resident of the PRC.

24.     Defendant Susan Liu ("Liu") was the Company's CFO during the period between June 2, 2008 and August 20, 2009.  Upon information and belief, Defendant Liu is a resident of the PRC.

25.     Defendant Chunqing Wang ("Wang") was the Company's CFO from 2004 until Liu's appointment.  Upon information and belief, Defendant Wang is a resident of the PRC.

26.     Defendant James Hsu ("Hsu") was a Director of the Company and member of the Audit Committee beginning in October 2007.  Hsu suddenly resigned from his position as Director on June 15, 2011.  Upon information and belief, Defendant Hsu is a resident of the PRC.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

27.     Defendant Liansheng Zhang ("L. Zhang"), at all relevant time herein, was a Director of the Company and member of the Audit Committee.   Upon information and belief, Defendant L. Zhang is a resident of the PRC.

28.     Defendant Yizhao Zhang ("Zhang"), at all relevant times herein, was a Director of the Company and served as Chairman of the Audit Committee.   Upon information and belief, Defendant Zhang is a resident of the PRC.

29.     Defendants Yu, Pan, Liu, Wang, Hsu, L. Zhang and Zhang are referred to herein as "Defendants" or "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

30.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and/or are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.   The Individual Defendants were and/or are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or benefits.   Each director and officer of the Company owed to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligation of fair dealing.

31.   Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

32.   To discharge their duties, the officers and directors of CEU were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial and operational affairs of CEU. By virtue of such duties, the officers and directors of CEU were required to, among other things:

(a) manage, conduct, supervise and direct the business and internal affairs of CEU in accordance with the laws and regulations of Delaware, the United States, and pursuant to the charter and bylaws of CEU;

(b) neither violate, nor knowingly permit any officer, director or employee of CEU to violate applicable laws, rules and regulations;

(c) remain informed as to the status of CEU's operations, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with applicable laws and regulations;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of CEU and procedures for the reporting of the business and internal affairs to the Board of Directors and to

11

periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial and management controls, such that CEU's operations would comply with all laws, CEU's financial statements and information filed with U.S. financial regulators and disseminated to the investing public and to CEU shareholders in Annual Reports would be accurate, and the actions of its directors would be in accordance with all applicable laws; and

(f) exercise reasonable control and supervision over the public statements to the securities markets, investors and public shareholders of CEU by the officers and employees of CEU and any other reports or other information required by law from CEU and to examine and evaluate any reports of examinations, audits or other financial information concerning the financial affairs of CEU and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

33. During the Relevant Period, the Individual Defendants, as senior executive officers and/or directors of CEU, were privy to confidential and proprietary information concerning CEU, its operations, products, business relationships, insider deals, financial condition, and future prospects via access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and board of directors

12

meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

34.     The Individual Defendants are liable as direct participants in, and as co-conspirators, with respect to the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to shareholders and the public.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to, and did, commit the fraudulent acts alleged herein.

35.     As senior executive officers and/or directors of a publicly-traded company whose common stock was, and continues to be, registered with the SEC pursuant to the Exchange Act, trades on the NYSE under the ticker symbol

13

"CEU," the Individual Defendants were, and continue to be, governed by the federal securities laws, and had a duty to disseminate accurate and truthful information with respect to CEU's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects; and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of CEU's common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Relevant Period violated these specific requirements and obligations. Accordingly, Individual Defendants' breached their fiduciary duties by causing and/or recklessly permitting violations of federal securities laws.

## Duties of the Audit Committee Defendants

36.    Defendants Hsu, Zhang, and L. Zhang, as members of the Audit Committee, had an affirmative duty of oversight and responsibility for the integrity of CEU's financial reporting.

37.    Pursuant to the Audit Committee's Charter, the purpose of the Audit Committee is to assist the Board in fulfilling their oversight responsibilities.  In addition to the Board's general oversight of management, the Audit Committee is charged with overseeing the accounting and financial reporting processes of CEU and the audits of the Company's financial statements. These duties include oversight responsibilities regarding the integrity of the Company's financial

14

statements, the Company's compliance with legal and regulatory requirements, the independent auditor's qualifications and independence, and the performance of the Company's internal audit function and independent auditor.  CEU's Audit Committee was charged with overseeing the accounting and financial reporting processes of CEU and the audits of the Company's financial statements.  Pursuant to its Charter, the Audit Committee is required to meet periodically with the Company's outside auditors, including at least once per quarter to review the accuracy and integrity of the Company's public financial statements for that quarter.

38.     Specifically, the Audit Committee Charter provides, *inter alia*, that:

To fulfill its responsibilities and duties, the Committee shall:

**Document Review**

1.  Review and assess the adequacy of this Charter periodically as conditions dictate, but at least annually (and update this Charter if and when appropriate).

2.  Review with representatives of management and representatives of the independent accounting firm the Corporation's audited annual financial statements prior to their filing as part of the Annual Report on Form 10-K. After such review and discussion, the Committee shall recommend to the Board of Directors whether such audited financial statements should be published in the Corporation's Annual Report on Form 10-K. The Committee shall also review the Corporation's quarterly financial statements prior to their inclusion in the Corporation's Quarterly Reports on Form 10-Q.

15

3. Instruct the independent accounting firm to review the Corporation's interim financial statements prior to their inclusion in the Corporation's Quarterly Reports on Form 10-Q.

**Independent Accounting Firm**

4. The Committee shall be directly responsible for the appointment, compensation, retention and oversight of the work of any independent accounting firm engaged by the Corporation for the purpose of preparing or issuing an audit report or performing other audit, review or attest services or any other related work. The authority of the Committee shall include ultimate authority to approve all audit engagement fees and terms. The Committee shall have the ultimate authority and responsibility to appoint, evaluate and, when warranted, replace, such independent accounting firm (or to recommend such replacement for shareholder approval in any proxy statement).

5. Resolve any disagreements between management and the independent accounting firm as to financial reporting matters.

6. Instruct the independent accounting firm that it should report directly to the Committee on matters pertaining to the work performed during its engagement and on matters required by applicable Regulatory Body rules and regulations.

7. On an annual basis, receive from the independent accounting firm a formal written statement identifying all relationships between the independent accounting firm and the Corporation consistent with Independence Standards Board Standard 1, as it may be modified or supplemented. The Committee shall actively engage in a dialogue with the independent accounting firm as to any disclosed relationships or services that may impact the independent accounting firm's objectivity and independence. The Committee shall take appropriate action to oversee the independence of the independent accounting firm.

16

8. On an annual basis, discuss with representatives of the independent accounting firm the matters required to be discussed by Statement on Auditing Standards 61, as it may be modified or supplemented.

9. Meet with the independent accounting firm prior to the audit to review the planning and staffing of the audit and consider whether or not to approve the auditing services proposed to be provided.

10. Evaluate the performance of the independent accounting firm and consider the discharge of the independent accounting firm when circumstances warrant. The independent accounting firm shall be ultimately accountable to the Committee.

11. Oversee the rotation of the lead (or coordinating) audit partner having primary responsibility for the audit and the audit partner responsible for reviewing the audit at least once every five years, and oversee the rotation of other audit partners, in accordance with applicable rules and regulations.

12. Consider in advance whether or not to approve any audit and non-audit services to be performed by the independent accounting firm required to be approved by the Committee pursuant to the rules and regulations of any applicable Regulatory Body and adopt and implement policies for such pre-approval.

13. The Committee shall have the authority to oversee and determine the compensation of any independent accounting firm engaged by the Corporation and shall notify the Corporation of anticipated funding needs of the Committee.

**Internal Audit Function**

14. Review the responsibilities, budget and staffing of any internal auditors.

15. Review the significant reports to management prepared by any internal auditors and management's responses.

**Financial Reporting Processes**

17

16. In consultation with the independent accounting firm and management, review annually the adequacy of the Corporation's internal control over financial reporting.

17. Review disclosures made to the Committee by the Corporation's chief executive officer and chief financial officer in connection with their certifications of the Corporation's Annual Reports on Form 10-K and Quarterly Reports on Form 10-Q, including disclosures concerning (a) evaluations of the design and operation of the Corporation's internal control over financial reporting, (b) significant deficiencies and material weaknesses in the design and operation of the Corporation's internal control over financial reporting which are reasonably likely to adversely affect the Corporation's ability to record, process, summarize, and report financial information, and (c) any fraud, whether or not material, that involves management or other employees who have a significant role in the Corporation's internal controls. The Committee shall direct the actions to be taken and/or make recommendations to the Board of Directors of actions to be taken to the extent such disclosures indicate the finding of any significant deficiencies in internal controls or fraud.

18. Regularly review the Company's critical accounting policies and accounting estimates resulting from the application of these policies and inquire at least annually of both the Corporation's internal auditors, if any, and the independent accounting firm as to whether either has any concerns relative to the quality or aggressiveness of management's accounting policies.

19. Request and review periodic reports from management of the Corporation as to the Corporation's processes for reporting on internal controls of the Corporation as required by Section 404 of the Sarbanes-Oxley Act of 2002.

**Compliance**

20. To the extent deemed necessary by the Committee to carry out its duties, it shall have the authority to engage outside counsel, independent accounting consultants and/or other experts at the Corporation's expense.

18

21. Determine the funding necessary for (i) compensation of any independent accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Corporation, (ii) ordinary administrative expenses of the Committee that are necessary or appropriate in carrying out the Committee's duties, and (iii) compensation of any outside advisors to be engaged by the Committee and notify the Corporation of anticipated funding needs of the Committee.

22. Establish written procedures for (a) the receipt, retention, and treatment of complaints received by the Corporation regarding accounting, internal accounting controls, or auditing matters; and (b) the confidential, anonymous submission by employees of the Corporation of concerns regarding questionable accounting or auditing matters.

23. Investigate any allegations that any officer or director of the Corporation, or any other person acting under the direction of any such person, took any action to fraudulently influence, coerce, manipulate, or mislead any independent public or certified accountant engaged in the performance of an audit of the financial statements of the Corporation for the purpose of rendering such financial statements materially misleading and, if such allegations prove to be correct, take or recommend to the Board of Directors appropriate disciplinary action.

**Reporting**

24. Prepare, in accordance with the rules of the SEC, as modified or supplemented from time to time, a written report of the Committee to be included in the Corporation's annual proxy statement for each annual meeting of stockholders.

25. To the extent required by any Regulatory Body, instruct the Corporation's management to disclose in its annual proxy statement for each annual meeting of stockholders, Annual Report on Form 10-K and Quarterly Report on Form 10-Q, the approval by the Committee of any non-audit services performed by the independent accounting firm, and review the substance of any such disclosure and the considerations relating to the compatibility of such services with maintaining the independence of the accounting

19

firm. While the Audit Committee has the responsibilities and powers set forth in this Charter, it is not the duty of the Audit Committee to plan or conduct audits or to determine that the Corporation's financial statements are complete and accurate and are in accordance with generally accepted accounting principles.

### The Company's Code of Business Conduct and Ethics

39.     CEU's Code of Business Conduct and Ethics (the "Code of Ethics") that governs the Company's directors and officers states that "[t]he Company is committed to the highest standards of business conduct and ethics."  Moreover, the Code of Ethics charges every employee (including directors and officers) with, *inter alia*, the following:

Each Employee must strictly comply with all applicable standards, laws, regulations and policies for accounting and financial reporting of transactions, estimates and forecasts.  Inaccurate, incomplete or untimely reporting will not be tolerated and can severely damage the Company and result in legal liability. Each Employee should be on guard for, and promptly report, any possibility of inaccurate of incomplete financial reporting. Particular attention should be paid to financial results that seem inconsistent with the performance of the underlying business, transactions that do not seem to have an obvious business purpose, or and requests to circumvent ordinary review and approval procedures. The Company's senior financial officers and other employees working in the Finance Department have a special responsibility to ensure that all of the Company's financial disclosures are full, fair accurate, timely and understandable. Any practice or situation that might undermine this objective should be reported to the Corporate Legal Department. An Employee with information relating to questionable accounting or auditing matters may also

20

confidentially, and anonymously if they desire, submit the information in writing to the Board's Audit Committee.

40. CEU has further published its Corporate Governance Guidelines which is designed to "promote the effective functioning of the Board and its committees and to reflect the Company's commitment to the highest standards of corporate governance." The Corporate Governance Guidelines further explain that "[t]he Board as a whole should have competency in the following areas: (i) accounting and finance; (ii) business judgment; (iii) management; (iv) industry knowledge; (v) leadership; and (vi) strategy/vision." The Corporate Governance Guidelines go on to describe the duties of each Board member as follows, in relevant part:

> *Basic Responsibility.*
> In accordance with the Bylaws and North Carolina law, the business and affairs of the Company are managed by, and under the direction of, *the Board which serves as the ultimate decision-making body of the Company*, except for those matters reserved to (or shared with) the stockholders. *The basic responsibility of the directors is to exercise their business judgment to act in what they reasonably believe to be the best interests of the Company and its stockholders. The Company' business is conducted by its officers and associates under the direction of the Chief Executive Officer and the oversight of the Board. The Board is elected by the stockholders of the Company to oversee management and to ensure that the long-term interests of the stockholders are being served.* The directors shall, as appropriate, take into consideration the interests of other stockholders, including associates, customers and the members of the communities in which the Company operates.
>
> *Code of Business Conduct and Ethics.*
> The Board believes that in order to oversee the successful perpetuation of the Company's business, the Board should set policies

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

(the "Code of Ethics") and regarding: (i) conflicts of interest; (ii) corporate opportunities; (iii) confidentiality; (iv) fair dealing; (v) protection and proper use of Company assets; (vi) compliance with laws, rules and regulations; and (vii) such other matters as the Board deems appropriate. The Code of Ethics should encourage the reporting of unethical or illegal behavior and ensure prompt and consistent action against violations of the Code of Ethics. Any waivers to the Code of Ethics for directors or executive officers may only be made by the Board or a Board committee, if so delegated, and must be publicly disclosed in a prompt manner as required by applicable NYSE Rules and SEC Rules.

[Emphasis added.]

41.    Throughout the Relevant Period, CEU's Board and its Audit Committee failed to conduct little, if any, oversight of the Company's internal controls over accounting and/or financial reporting and consciously disregarded their duties to monitor such controls and accounting.  These Defendants, therefore, completely failed to perform their duties in good faith to prevent the fraudulent accounting practices and the resulting misrepresentations in the Company's SEC filed reports and financial statements.

## PENDING SECURITIES CLASS ACTION

42.    On October 11, 2011, the Honorable Christina A. Snyder ("Judge Snyder") of the Central District of California, issued a minute order (the "Order") in the related consolidated securities class action, *In re China Education Alliance, Inc. Securities Litigation*, CV 10-9239 CAS (JCx), (the "Class Action") denying the Class Action defendants' motion to dismiss the securities action in its entirety. In the Order denying the defendants' motion to dismiss, Judge Snyder issued

22

several findings concerning certain conduct of the defendants as also alleged herein by Plaintiff. Among the findings in the Order, Judge Snyder held that the Kerrisdale Report could be relied upon by plaintiffs, finding that because the report was issued by Kerrisdale Capital, an identifiable and independent analyst and research firm, the report "does not implicate the same skepticism as a 'traditional' anonymous source." *Id.* at 6.

43.     Additionally, as set out in the Order, Judge Snyder found sufficient *indicia* that the Class Action defendants' conduct was committed with "fraudulent intent." Specifically, Judge Snyder concluded, *inter alia*, that:

> The Court finds that plaintiffs have adequately alleged scienter. The Supreme Court recently instructed courts to view scienter under the PSLRA holistically, and deny a motion to dismiss if the inference of scienter advanced by plaintiffs is "at least as compelling as any opposing inference one could draw from the facts alleged." *Matrixx Initiatives, Inc. v. Siracusano*, 141 S. Ct. 1309, 1324 (2011). Although signatures on an SEC filing "add nothing substantial to the scienter calculus," plaintiffs have offered substantially more than defendant Yu's signatures. *Zucco*, 552 F.3d at 1003–04. ***In particular, plaintiffs have alleged that CEU has filed significantly disparate revenue figures in China and the United States; that plaintiffs' own investigators toured CEU's on-site "state-of-the-art" facility in China only to find it an empty building; that witnesses in China told plaintiffs' investigators that CEU was not the owner of the building; that CEU has had rapid turnover of its CFOs during the class period; and that many of the links on CEU's website did not work properly despite its online segment purportedly deriving millions of dollars each year. Although each fact taken alone might not give rise to an inference of fraudulent intent, taken together, plaintiffs' theory is "at least as compelling as any opposing inference one could draw from the facts alleged."*** *Matrixx*, 141 S. Ct. at 1324.

[Emphasis added.]

## SUBSTANTIVE ALLEGATIONS

### A.     CEU's Structure and Operating Subsidiaries

44.     To have its stock publicly traded in the United States, CEU employed a device called a "reverse merger" in 2004.  In a reverse merger, a publicly traded shell company acquires the private company seeking to go public. In exchange, the shareholders of the former private company receive a controlling share of the public company.

45.     As a result of the reverse merger, CEU became a holding company that operates through Harbin Zhong He Li Da Education Technology, Inc. ("ZHLD").

### B.     Harbin Zhong He Li Da Education Technology, Inc. (ZHLD):

46.     At all relevant times herein, ZHLD was the Company's primary operating subsidiary doing business in China.

47.     ZHLD was engaged in the Company's online education segment ("Online Segment") which, during the Relevant Period, accounted for over 60% and 70% of the Company's total revenue and gross profit, respectively.

48.     The Online Segment purports to be exam-oriented education for primary, middle and high school students. Through its websites, including www.edu-chn.com, the Company offers exam papers, test papers and video-on-demand for free and paid download by students.

49.    According to CEU's 10-Ks filed with the SEC during the Relevant Period, the Online Segment accounted for a majority of the Company's revenues and profits for the fiscal years ended December 31, 2008, and 2009:

|  | FY 2008 | FY 2009 |
|---|---|---|
| Total Revenue | $24,851,017 | $36,967,483 |
| Total Gross Profit | $19,866,078 | $29,602,544 |
| Online Segment Revenue | $16,706,917 | $22,238,325 |
| Online Segment Gross Profit | $13,847,324 | $17,653,806 |
| Percentage        of        Total | 67% | 60% |
| Percentage of Total Gross | 70% | 79% |

## C.    Heilongjiang Zhonghe Education Training Center ("ZTEC")

50.    At all relevant times, ZTEC was a wholly owned subsidiary of ZHLD. ZTEC was formed in 2005 in connection with CEU's acquisition of a training center of the same name to provide on-site education training located at Building 39, High & New Technology Developing Zone, Sidao Street, Qianshan Road, Nagang District, Harbin, China. This building is a 36,600 square foot facility. Throughout the Relevant Period, CEU falsely claimed that it owned this building, which CEU characterized as including "17 modern classrooms" that can accommodate 1,200 students, and further described this training center as "state-of-the-art" and "modern."

51.    According to the Company's 10-Ks filed during the Relevant Period, the Training Center segment accounted for a substantial portion of the Company's revenue and gross profit for the fiscal years ended December 31, 2008 and 2009.

|  | FY 2008 | FY 2009 |
|---|---|---|
| Total Revenue | $24,851,017 | $36,967,483 |

25

| Total Gross Profit | $19,866,078 | $29,602,544 |
|---|---|---|
| Online Segment Revenue | $5,552,969 | $12,097,325 |
| Online Segment Gross Profit | $3,630,128 | $9,527,837 |
| Percentage of Total | 22% | 33% |
| Percentage of Total Gross | 18% | 32% |

### D.   Other Subsidiaries

52.   CEU controlled four other subsidiaries through ZHLD:

a.   Harbin New Discovery Media Co. ("New Discovery"), is a joint venture created by ZHLD and Harbin Daily Newspaper Group on April 18, 2008.  The joint venture was formed for the publication of a scientific newspaper. ZHLD owns 49.02% of New Discovery.

b.   Beijing Hua Yu Zhong Technology Development Co. Ltd. ("BHYHZ"), was formed on September 30, 2006.  Thereafter, 30% of BHYHZ was transferred to the National Vocational Education Association of China for no consideration.  BHYHZ remains in the development stage.  ZHLD owns 70% of BHYHZ.

c.   Zhong He Li Da (Beijing) Management Consultant Co. Ltd. ("ZHLDBJ") is a joint venture between ZHLD and Guang Li, formed on January 4, 2009, as a vocational training business.  ZHLD owns 85% of ZHLBDJ.

d.   Beijing New Shifan Education & Technology Co. Ltd. ("New Shifan") was incorporated in February 2010.  New Shifan published a magazine and manages a nationwide contest.  ZHLD owns 65% of New Shifan.

e. In connection with an April 27, 2008 share exchange between CEU and World Exchanges, Inc. ("WEI"), WEI became a 70% owned subsidiary of CEU. WEI in turn owned 100% of Beijing Wei Shi Yi Tong Education Technology. This acquisition was not fully completed and was ultimately cancelled in September 2010. According to CEU's 2009 10-K, WEI's operations and financial position were not consolidated or presented in the Company's financial statements as of December 31, 2009 and 2008 and for the years then ended.

53. Below is an organizational chart of the Company derived from the Company's 2009 10-K.



**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

## DEFENDANTS' OMISSIONS AND MISREPRESENTATIONS OF

## MATERIAL FACT

### CEU's 2008 Financial Results Are Materially False and Misleading

54.    The Relevant Period begins on May 15, 2008 when the Company filed with the SEC its financial results for the first quarter on Form 10-Q containing false and misleading financial statements.

55.    The false and misleading 10-Q was signed by Defendants Yu and Wang. Defendants Yu and Wang signed the accompanying Sarbanes-Oxley ("SOX") certifications, attesting to the accuracy of CEU's 10-Q.

56.    The 10-Q states in relevant part:

|  | Q 1 2008 |
|---|---|
| Total Revenue | $ 4,070,417 |
| Total Gross Profit | $ 3,245,785 |
| Online Segment Revenue | $ 3,086,785 |
| Online    Segment    Gross | $ 2,661,743 |
| Training Center Revenue | $ 983,632 |
| Training    Center    Gross | $ 584,042 |

57.    The Online Segment was 76% of CEU's revenue for Q1.

58.    On August 14, 2008 the Company filed with the SEC its financial results for the second quarter on Form 10-Q containing false and misleading financial statements.

59.    The false and misleading 10-Q was signed by Defendants Yu and Liu. Defendants Yu and Liu also signed the accompanying SOX certifications, attesting to the accuracy of CEU's 10-Q.

28

60.    The 10-Q states in relevant part:

|  | Q2 2008 | Six Months Ended |
|---|---|---|
| Total Revenue | $ 4,458,694 | $8,529,111 |
| Total Gross Profit | $ 3,721,002 | $6,966,787 |
| Online          Segment | $ 3,853,942 | $6,940,727 |
| Online  Segment  Gross | $ 3,371,117 | $6,032,860 |
| Training          Center | $ 604,752 | $1,588,384 |
| Training  Center  Gross | $ 349,885 | $933,927 |

61.    On November 13, 2008 the Company filed with the SEC its financial results of the third quarter on Form 10-Q containing false and misleading financial statements.

62.    The false and misleading 10-Q was signed by Defendants Yu and Liu. Defendants Yu and Liu also signed the accompanying SOX certifications, attesting to the accuracy of CEU's 10-Q.

63.    The 10-Q states in relevant part:

|  | Q3 2008 | Nine Months Ended |
|---|---|---|
| Total Revenue | $ 7,146,389 | $ 15,675,500 |
| Total Gross Profit | $ 5,764,328 | $ 12,731,115 |
| Online          Segment | $ 5,126,456 | $ 12,067,183 |
| Online Segment Gross | $ 4,411,461 | $ 10,444,321 |
| Training          Center | $ 2,019,933 | $ 3,608,317 |
| Training Center Gross | $ 1,352,867 | $ 2,286,794 |

64.    On March 30, 2009, the Company filed with the SEC its fiscal 2008 annual report on Form 10-K. The 10-K contains false and misleading financial statements for fiscal year 2008.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

65.     The false and misleading 10-K was signed by Defendants Yu, Liu, Hsu and L. Zhang. Defendants Yu and Liu signed the accompanying SOX certifications, attesting to the accuracy of CEU's 10-K.

66.     The 10-K states in relevant part:

|  | FY 2008 |
|---|---|
| Total Revenue | $24,851,017 |
| Total Gross Profit | $19,866,078 |
| Online Segment Revenue | $16,706,917 |
| Online Segment Gross | $13,847,324 |
| Training Center Revenue | $5,552,969 |
| Training Center Gross | $3,630,128 |

67.     The revenue and gross profit reported by the Company throughout fiscal year 2008 were false and misleading when made for the following reasons:

a.      The SAIC filing for ZHLD, CEU's main operating subsidiary, engaged in the Online Segment, reported revenue for the entire fiscal year of 2008 that was a fraction of what CEU purportedly reported as revenue in its Q1 10-Q:

| The            (In RMB) | Fiscal Year 2008 |
|---|---|
| Revenue | ¥ 4,254,837.60 |
| Net profit | ¥120,379.67 |
| (In USD)[4] | |
| Revenue | $ 616,643 |
| Net profit | $17,446 |

---

[3]  The SAIC (State Administration for Industry and Commerce) is the Chinese government body that regulates industry and commerce in China.  It is primarily responsible for business registration, business licenses issuing and renewing, and acts as the government supervisor of corporations.  All Chinese companies are required to file financial statements with the Chinese government annually or bi-annually.

[4]  Exchange rate of RMB 6.9: USD 1.

30

b.      Private investigators obtained copies of the SAIC filings referenced throughout this Complaint from the local PRC central registry where the subsidiaries are located. Notably, the SAIC filings corroborate the amounts in the SAIC filings that the Kerrisdale Report references.

c.      Under PRC law, penalties for filing false SAIC filings include fines and revocation of the entity's business license.[5] If an entity's business license is revoked, the People's Bank of China[6] requires the bank account of that entity be closed.[7]  Without a business license the entity cannot legally conduct business in the PRC.

d.      ZHLD's financial statements filed with the local State Administration of Taxation ("SAT")[8] obtained by private investigators, are substantially the same as ZHLD's SAIC filings.[9]  The profit statement of the tax filing provides in relevant part:

| FY 2008 | (unit:   RMB   ten | (unit: USD) |
|---|---|---|
| 主营业务收入/ Main business income | 425 | 625,000.00 |
| 销售成本/ Sales cost | 81 | 119,117.65 |

[5]  "Measures for the Annual Inspection of Enterprises" issued in February 24, 2006, Article 20.

[6]  People's Bank of China in PRC is equivalent to the Federal Reserve in the U.S.

[7]  "Measures for the Administration of RMB Bank Settlement Accounts" issued in April 2003 (No. 5 [2003]), Article 49.

[8]  The PRC State Administration of Taxation is equivalent to the Internal Revenue Service in the U.S.

[9]   Under PRC law, filing false tax documents is a crime subject to severe criminal and civil penalties, including imprisonment.  *See*, Article 201 of the Criminal Law of PRC; Article 63 of the Law of PRC Concerning the Administration of Tax Collection.

| 销售税金及附加/ Sales taxes and | 0 | 0.00 |
|---|---|---|
| 销售费用/ Sales expenses | 253 | 372,058.82 |
| 管理费用/Administrative expenses | 85 | 125,000.00 |
| 财务费用/ Financial expenses | 53 | 77,941.18 |
| 投资收益/ Income from investment | 0 | 0.00 |
| 其他业务利润/ Other business profit | 0 | 0.00 |
| 营业外收入/ Non-business income | 59 | 86,764.71 |
| 营业外支出/ Non-business expenditure | 0 | 0.00 |
| 利润总额/ Total profit | 12 | 17,647.06 |
| 净利/ Net profit | 12 | 17,647.06 |

e.     BHYHZ's SAIC filings state that for the entire year of 2008, it had zero revenue and a net loss of (¥938,646.13) or ($136,035.67).

68.     Additionally, the SAIC filings of New Discovery for entire year of 2008, states that it had revenue of ¥232,935.00 and a net loss of (¥1,353,977.96), or $33,559 in revenue and net loss of ($196,228.69) (assumes RMB 6.9: USD 1).

**CEU's 2009 Financial Results Are Materially False and Misleading**

69.     On May 15, 2009, the Company filed with the SEC its financial results of the first quarter on Form 10-Q containing false and misleading financial statements.

70.     The false and misleading 10-Q was signed by Defendants Yu and Liu. Yu and Liu signed the accompanying SOX certifications, attesting to the accuracy of CEU's 10-Q.

71.     The 10-Q states in relevant part:

| Q1 2009 |
|---|

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

| Total Revenue | $ 8,204,079 |
|---|---|
| Total Gross Profit | $ 6,085,183 |
| Online Segment Revenue | $ 4,829,488 |
| Online     Segment     Gross | $ 3,630,381 |
| Training Center Revenue | $ 2,547,099 |
| Training    Center    Gross | $ 1,682,449 |

72.    The Online Segment was purportedly 59% of CEU's revenue for Q1.

73.    On August 11, 2009 the Company filed with the SEC its financial results for the second quarter on Form 10-Q containing false and misleading financial statements.

74.    The false and misleading 10-Q was signed by Defendant Yu and Liu. Defendants Yu and Liu also signed the accompanying SOX certifications, attesting to the accuracy of CEU's 10-Q.

75.    The 10-Q states in relevant part:

76.

| | Q2 2009 | Six Months Ended |
|---|---|---|
| Total Revenue | $ 8,118,373 | $ 16,322,452 |
| Total Gross Profit | $ 6,512,497 | $ 12,597,680 |
| Online Segment Revenue | $ 5,470,628 | $ 10,300,116 |
| Online Segment Gross | $ 4,436,316 | $ 8,066,697 |
| Training Center Revenue | $ 2,007,947 | $ 4,555,046 |
| Training Center Gross | $ 1,506,158 | $ 3,188,607 |

78.    On November 16, 2009 the Company filed with the SEC its financial results for the third quarter on Form 10-Q containing false and misleading financial statements.

33

79. The false and misleading 10-Q was signed by Defendants Yu and Pan. Defendants Yu and Pan also signed the accompanying SOX certifications, attesting to the accuracy of CEU's 10-Q.

80. The 10-Q states in relevant part:

|  | Q3 2009 | Nine Months Ended |
|---|---|---|
| Total Revenue | $ 10,231,678 | $ 26,554,130 |
| Total Gross Profit | $ 8,222,988 | $ 20,820,668 |
| Online Segment | $ 5,768,667 | $ 16,068,783 |
| Online Segment Gross | $ 4,544,683 | $ 12,611,380 |
| Training Center | $ 3,853,285 | $ 8,408,331 |
| Training Center Gross | $ 3,117,070 | $ 6,305,677 |

81. On March 30, 2010, the Company filed with the SEC its fiscal 2009 annual report on Form 10-K. The 2009 10-K contains false and misleading financial statements for fiscal years 2008 and 2009.

82. The false and misleading 10-K was signed by Defendants Yu, Pan, Hsu, Zhang and L. Zhang. Defendants Yu and Pan signed the accompanying SOX, certifications attesting to the accuracy of CEU's 10-K.

83. The 2009 10-K states in relevant part:

|  | FY 2009 |
|---|---|
| Total Revenue | $36,967,483 |
| Total Gross Profit | $29,602,544 |
| Online Segment Revenue | $22,238,325 |
| Online Segment Gross | $17,653,806 |
| Training Center Revenue | $12,097,375 |
| Training Center Gross | $ 9,527,837 |

84.   The revenue and gross profits reported by the Company for the fiscal year 2009, as described in the aforementioned statements, were false and misleading when made for the following reasons:

a.   The SAIC filing for ZHLD for the entire year of 2009 reports revenue that was a fraction of the revenue of what the Company had reported in its 10-Q for the quarter.

| (In RMB) | 2009 |
|---|---|
| Revenue | ¥4,760,000.00 |
| Net profit | ¥1,460,000.00 |
| (In USD)[10] | |
| Revenue | $ 700,000 |
| Net profit | $214,706 |

b.   Additionally, ZHLD's profit statement filed with the SAT, obtained by private investigators, provided in relevant part:

| 2009 | (unit: RMB ten | (unit: USD) |
|---|---|---|
| 主营业务收入/ Main business income | 476 | 700,000.00 |
| 销售成本/ Sales cost | 80 | 117,647.06 |
| 销售税金及附加/ Sales taxes and | 0 | 0.00 |
| 销售费用/ Sales expenses | 77 | 113,235.29 |
| 管理费用/ Administrative expenses | 172 | 252,941.18 |
| 财务费用/ Financial expenses | 2 | 2,941.18 |
| 投资收益/ Income from investment | 0 | 0.00 |
| 其他业务利润/ Other business profit | 0 | 0.00 |
| 营业外收入/ Non-business income | 3 | 4,411.76 |
| 营业外支出/ Non-business expenditure | 2 | 2,941.18 |

---

[10]   Exchange rate of RMB 6.8 : USD 1.

35

| 利润总额/ Total profit | 146 | 214,705.88 |
|---|---|---|
| 净利/ Net profit | 146 | 214,705.88 |

85.    The falsity of the purported 2009 revenues and profits is further demonstrated by New Discovery's SAIC filings which state for the entire year of 2009, New Discovery had revenue of ¥580,410.00 and a net loss of (¥9,367.07), or $85,354 in revenue and ($1,377.51) (assumes RMB 6.8: USD 1).

86.    Additionally, BHYHZ's SAIC filings for the entire year of 2009, state that it had zero revenue and net loss of (¥847,745.00) or ($128,638.97).

87.    Additionally, the 2009 10-K was false because it also materially misstated revenue and profits for FY 2008.

**Additional Allegations Demonstrating the Reckless Falsity of
Reported Revenue and Profits for CEU's Two Main Business Segments**

**i.      The Training Center Business Is A Sham**

88.    The Training Center segment purportedly accounted for 22% ($5.5 million) and 33% ($12 million) of CEU's revenue for fiscal years ended 2008 and 2009, respectively.

89.    According to the Kerrisdale Report (pp. 11-20), CEU's training center facility, the Heilongjiang Zhonge Education Training Center in Harbin (the "Training Center Building") is essentially "a vacant, unfurnished building with, little sign of use."

90.     According to CEU, the Training Center Building variously accounted for all and/or 60% of the Training Center segment revenue during the Relevant Period.

91.     In the Company's SEC filings referenced above, CEU had variously claimed that it owned the Training Facility and trumpeted the impressive "state of the art" and "modern" facilities. For example:

a.     2008 10-K: in describing the "Training Center" segment of CEU's business, CEU explained that it "provide[s] on-site teaching services under the 'Big Classroom of the Famed Instructors,' *our state-of-the-art* center in Harbin." The Company further explained: "[a]t this center, we offer both classroom training and one-on-one tutoring. The training center has approximately 36,600 square feet, with 17 *modern classrooms and a capacity for 1,200 students*." Elsewhere in the 10-K, CEU stated: "[w]e have a 36,600 square foot training facility in Harbin, Heilongjiang Province, PRC, which has 17 class rooms and can accommodate 1,200 students . . . ."

b.     Identical disclosures were contained in the Company's 2009 10-K and in the interim 10-Q reports filed with the SEC all throughout the Relevant Period noted above.

92.     The Kerrisdale Report (pp. 17-21) contained pictures of each floor which revealed that each of the six floors of the building was empty and unfurnished with some space occupied by an unrelated company.

37

93.    The Kerrisdale Report also linked to a video of a walk through tour of the Training Center Building, http://www.youtube.com/watch?v=IacP8G3v5rw (last checked April 29, 2011), further demonstrating the empty swaths of space in the building and the absence of any classrooms.

94.    In a response, on December 7, 2010 CEU conducted a conference call to investors reading pre-prepared questions and answers to investors. Speaking for the Company were Defendants Yu, with Pan translating. Contrary to CEU's statements of a "modern" and "state-of-the-art" facility, Yu and Pan claimed that the Training Center Building was an "older" training center and that it was undergoing "remodeling" when Kerrisdale visited the facility. Pan and Yu claimed that the remodeling had been completed.

95.    Private investigators retained by plaintiffs' counsel in the related Class Action visited the Training Center and found that: (i) Pan and Yu's statements were false because there was no renovation at the Training Center Building; (ii) ZTEC or the Company did not even own the Training Center Building; and (iii) the Training Center Building does not conduct CEU or ZHLD's Training Center business. Specifically, the following steps were taken by investigators:

a.    Investigators conducted internet searches on popular Chinese search engines and located a ZTEC advertisement listing a telephone number for the Training Center Building, 0451-87007386.

38

b.      In early April 2011, investigators called the number for the Training Center which connected the investigators to Heilongjiang Adult Intermediate Trade Education School (the "Adult School"), not ZTEC or CEU. Thus, the number CEU advertised for ZTEC (its Training Center) was actually the phone number for an unaffiliated adult school having nothing to do with CEU or its business.

c.      The investigators called Telephone Directory Services (114), and could not locate another telephone number for ZTEC.

d.      On April 7, 2011, investigators conducted onsite interviews at the Training Center Building. Investigators interviewed the security gatekeeper. The security gatekeeper stated that the owner of the Training Center Building was the Adult School, not ZTEC or CEU. In fact, the gatekeeper explained that the Adult School was annoyed because ZTEC had once sent a camera crew and foreigners to take photos and videos in the building and that ZTEC falsely claimed it owned the building, when it did not.

e.      On April 8, 2011, investigators interviewed staff at the Adult School and the Adult School staff confirmed that they owned the building. Adult School staff told the investigators that floors 1, 2, and 6 are vacant and available for immediate lease. Pictures taken by the investigators are attached hereto as Exhibit 2, and referenced herein.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

f.     When asked about ZTEC, the Adult School staff stated that ZTEC had once leased space in the building and the Adult School had a cooperative relationship with ZTEC, but the lease and the relationship had been terminated in 2009.

g.     Other tenants in the building, namely the software companies on the third and fourth floors, confirmed to the investigators that ZTEC did not own or occupy the building.

h.     The fifth floor is occupied by the Adult School.

### ii.     The Online Segment is a Grossly Exaggerated

96.     During the Relevant Period, the Online Segment purportedly accounted for 67% or ($16.7 million) and 60% ($22.2 million) of CEU's total revenue for fiscal years ended 2008 and 2009, respectively. In the Company's 2009 10-K, CEU states in relevant part:

> Our principal business is the distribution of educational resources through the internet. Our website, www.edu-chn.com, is a comprehensive education network platform which is based on network video technology and large data sources of elementary education resources. We have a database comprised of such resources as test papers that were used for secondary education and university level courses as well as video on demand. Our data base includes more than 350,000 exams and test papers and courseware for college, secondary and elementary schools. While some of these exams were given in previous years, we engage instructors to develop new exams and a methodology for taking the exams. We market this data base under the name "Famous Instructor Test Paper Store." We also offer, though our website, video on demand, which includes tutoring of exam papers and exam techniques. We compliment the past exams and test papers by providing an interactive platform for students to understand the key points from the papers and exams. Although a

40

number of the resources are available through our website without charge, we charge our subscribers for such services as the Famous Instructor Test Paper Store and the video on demand. Subscribers can purchase debit cards which can be used to download material from our website.

97.     The Kerrisdale Report concluded that the Company could not be generating the tens of millions of the dollars of revenue from the Online Segment, because, among other things, "the company's websites do not work, despite the fact that CEU is an online education provider and its websites are the company's main revenue generating assets." See Kerrisdale Report, pp. 1, 3-4. The Kerrisdale Report links three videos demonstrating these failures on the Company's main website: www.edu-chn.com and two of the Company's other websites: www.ok1234567.com and www.360ve.com.

98.     The first video demonstrates the non-functioning payment systems on CEU's core website: www.edu-chn.com. The video is located at: http://www.youtube.com/watch?v=pQCW-Y9L_Xg and is referenced herein.

99.     The second video demonstrates further website errors and compares CEU's websites to their competitors. The video is located at: http://www.youtube.com/watch?v=WU3OCqluEnA&feature=related and is referenced herein.

100.    The third video demonstrates additional broken links and irrelevant content. The video is located at: http://www.youtube.com/watch?v=A5Ij8Pdm0R4 and is referenced herein.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

101.   The Company has stated in its SEC filings throughout the Relevant Period that a student can also purchase materials from the Company's website through pre-paid debit or learning cards.

102.   According to the Kerrisdale Report (p. 5), Kerrisdale hired a Harbin based investigator to attempt to purchase the pre-paid debit/learning card on-line, but those attempts through E-Bank and the mobile-phone payment were not successful. According to Kerrisdale, the investigator called the telephone numbers on the Company's website, and the people on the other lines hung up, one number led to an unidentified switchboard number, and the other requested the investigator to leave a telephone number for a return call—no return call was made to the investigator.

103.   According to the Kerrisdale Report (p. 4), Kerrisdale also hired a Harbin based investigator to visit bookstores in Harbin to determine whether the learning cards were available for sale. After visiting fifteen (15) Harbin bookstores, only two (2) of the bookstores carried learning cards, but they were for CEU's competitors. None of the bookstores sold CEU's learning cards.

104.   The Company addressed these findings during the December 7, 2010 conference call through Yu with Pan translating. According to Yu and Pan, the "majority of our [learning] cards are sold by our sales people to students. We have around 200 sales people located at different areas in North China, not including part-time sales agents." As to the non-functionality of the Company's website, Pan

42

and Yu claimed the website problems were the result of the Company's servers being in North China and Kerrisdale had difficulty accessing from outside China, and that, in any event, the Company planned to increase the number of servers.

105. Defendants' explanations were false. On December 7, 2010, Kerrisdale posted a response to the Company's December 7, 2010 conference call and noted that "we had multiple investigators examine the company's websites from inside Harbin, as opposed to only the United States."

106. Moreover, Kerrisdale's findings are corroborated by private investigators:

a. Contrary to Yu and Pan's contention that the majority of the learning cards are sold by sales agents to students, in early April 2011, the investigator called the number listed on CEU's website inquiring about purchasing a learning card from an agent. The investigator was told by the person on the phone that learning cards were only available at the Company's campuses in Harbin. Upon visiting the campuses in Harbin, the investigator was told something different: that the learning cards were available in grocery stores, bookstores, and stationary stores near elementary schools and high schools.

b. Private investigators visited shops on Yiman Street in Harbin, where: (1) Jihong Elementary School—a municipal level key elementary school, (2) PS3 Middles School of Harbin-a provincial level key middle school, (3) and

numerous training and education entities are located. The investigators visited the following locations:

> i.   Xingming Stationary Store, had an advertisement of CEU's learning card on the front door of the shop. The owner told the investigator that the store did not offer CEU's learning cards for sale anymore, because no customers ever purchased them, so the shop returned the cards to CEU.

> ii.   Xinhai Stationary Store, which is located across the street from Jihong Elementary School and Yiman Park and is close to PS3 Middle School, had an advertisement of CEU's learning card on the front door of the shop. The owner told the investigator that the shop had very poor sales of CEU's learning cards, as there was a lack of promotion of the card, *i.e.* students and teachers were not aware of CEU and its products.

c.   In early April 2011, the investigators also visited shops near Anjing Elementary School, but could not find any stores that sold CEU's learning card.

d.   In April 2011, the investigators were informed by Ms. Shi from CEU's marketing department, that learning cards were not available in Liaoning province, a location where CEU had claimed it had sales agents. Ms. Shi further stated that the Company only had sales agents in Harbin City and nowhere else.

107.   Kerrisdale also supported its conclusion that CEU's Online Segment could not generate the revenue CEU reported in its SEC filings because the

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

"company's website receive a fraction of the visitor traffic generated by ... [a competitor], which reports lower revenue and lower margins than CEU despite having [a] functional website, a larger number of web assets, and operational payments scheme and no broken links on their sites." See Kerrisdale Report, pp. 5-10.

### iii.    The False Financial Reporting would have been Discovered had Defendants' Performed Reasonable, Good Faith Oversight

108.    The breadth of the false financial reporting and misstatements suggests blatant breaches of Defendants' fiduciary duties. In addition to the false revenue and profit for fiscal periods of 2008 and 2009, CEU's 2007 financial results, filed with the SEC on March 31, 2008, on Form 10-KSB likewise overstates revenues several times over. In the 10-KSB CEU reported the following for fiscal year 2007: (i) total revenue of $17.3 million; (ii) Online Segment revenue of $11.5 million; and (iii) Training Center revenue of $3.7 million. The SAIC filing for ZHLD for that period shows revenue of merely $23,904, and for BHYHZ shows zero revenue for 2007.

109.    The Kerrisdale Report also reveals that CEU's revenue and gross profit reported to the SAIC for 2006 is merely a fraction of what CEU had reported in its fiscal 2006 annual report filed with the SEC. *See* Kerrisdale Report, p. 24.

110.   In addition to the false reassurances set forth above, the Company issued a number of other false reassurances during the December 7, 2010 conference call.

a.   <u>SAIC filings</u>: Yu and Pan did not dispute the SAIC filings did not match the Company's SEC filings but merely stated that the "severe" discrepancies were present because SAIC financial statements need not be consolidated, because of differences in PRC GAAP and US GAAP, that competitors may review SAIC filings to gain a competitive advantage, and suggested that this was fine because essentially everyone else was doing it. Pan and Yu then stated that PRC tax documents filed with SAT are "much more reliable than SAIC filings" because filing false information with the SAT can result in a fine. Pan and Yu stated in relevant part:

> The SAT requires audited financial data including balance sheet, income statement and cash flow statement and the tax bureaus audit those reports quite frequently themselves and fine offenders who under-report to the SAT. Financial statements to the SAT are much more reliable than SAIC filings. It is with the SAT numbers that our auditor verifies our earnings. Unfortunately, these reports are not readily available to the public.

b.   These explanations are false and defy common sense and logic. As noted above, filing false SAIC filings results in fines and possible revocation of the entity's business license, rendering the business unable to maintain a bank account or even legally conduct business. The unexplained differences in PRC and US GAAP do not account for the vast differences between CEU's reported revenue

46

to the SEC and the revenue reported in the Company's SAIC filings. Consolidation is not an issue since private investigators obtained the SAIC filings for the Company's largest operating subsidiary, ZHLD. Additionally, the explanation that a competitor may obtain a competitive advantage by reviewing SAIC filings is puzzling--a competitor could merely review the Company's SEC filings, if in fact the SEC filings were accurate. Most importantly, the investigators obtained the SAT (tax) filings of the ZHLD which report the same (lower) revenue as ZHLD's SAIC filings, which is lower than the revenue reported in the SEC filings.

### iv.    The Danger of Reverse Mergers

111.    The manner in which the Company attained its U.S. listing, *i.e.,* reverse merger ("RCM"), further supports an inference that Defendants' actions were wrongful.

a.    Although an RCM allows a Chinese company, like CEU, to trade on a U.S. stock exchange and tap into the lucrative American investment market these companies' assets and operations are often solely located in China. This limits the SEC's ability to regulate and enforce the securities laws against Chinese companies, especially given that these corporations did not complete the more rigorous requirements of an initial public offering.

b.    Shielded by the geographic distance of thousands of miles and operating under a regulatory framework that is a world apart from the SEC's oversight, RCM companies have few incentives to provide complete and accurate

47

disclosures to American investors and every incentive to maximize investments and profits. An August 28, 2010 article in *Barron's* by Bill Alpert and Leslie P. Norton entitled, "Beware This Chinese Export," discusses the enforcement problems that American regulators face when dealing with Chinese companies that trade on U.S. exchanges through RCMs. The article states that "[t]he SEC's enforcement staff can't subpoena evidence of any fraudulent activities in China, and Chinese regulators have little incentive to monitor shares sold only in the U.S."

     c.    RCMs were effective in attracting interest in small Chinese companies that were purportedly poised for growth and achievement. According to an article published on December 21, 2010 and entitled "Greenberg: Dangers Lurk in Chinese Reverse Mergers," there are around 300 reverse mergers trading in the U.S. American investors have suffered losses in excess of $30 billion as a result of their investments in RCMs.

     d.    U.S. regulators have finally begun to take notice of the opportunities for manipulation and fraud that RCMs create. The SEC has recently established a task force to investigate investors' claims regarding the impropriety and fraud of RCMs trading on the U.S. markets. SEC Commissioner Luis A. Aguilar (the "Commissioner") discussed Chinese reverse mergers and the process of "backdoor registration," stating:[11]

---

[11] The speech is available at http://sec.gov/news/speech/2011/spch040411laa.htm#P79_43025.

In the world of backdoor registrations to gain entry into the U.S. public market, the use by Chinese companies has raised some unique issues, even compared to mergers by U.S. companies. Two important ones are:

- First, there appear to be **systematic concerns with the quality of the auditing and financial reporting**; and

- Second, even though these companies are registered here in the U.S., **are limitations on the ability to enforce the securities laws, and for investors to recover their losses when disclosures are found to be untrue, or even fraudulent**.

**I am worried by the systematic concerns surrounding the quality of the financial reporting by these companies**. In particular, according to a recent report by the staff of the Public Company Accounting Oversight Board (PCAOB), U.S. auditing firms may be issuing audit opinions on the financials, but not engaging in any of their own work. Instead, the U.S. firm may be issuing an opinion based almost entirely on work performed by Chinese audit firms. If this is true, it could appear that the U.S. audit firms are simply selling their name and PCAOB-registered status because they are not engaging in independent activity to confirm that the work they are relying on is of high quality. This is significant for a lot of reasons, including that the PCAOB has been prevented from inspecting audit firms in China.

[Emphasis added.]

112.   The revolving door in CEU's CFO position creates additional concerns.  During the Relevant Period, CEU had three different CFOs, Defendants Wang, Liu and Pan. Additionally, on February 28, 2011, Defendant Pan suddenly resigned as CFO. Thus, during a three year period starting at the beginning of the Relevant Period, the Company has had four different CFOs.

113.   Moreover, CEU has suffered high turnover of auditors. Since 2004 the Company has had four independent auditors—none of the auditing firms are top

49

100 accounting firms. Even after the fallout of the Kerrisdale Report and CEU's efforts to reassure investors regarding the Company's allegedly stellar financial results and assets, CEU has failed to hire a "Big Four" accounting firm to audit is financial statements.

## THE DAMAGE CAUSED BY DEFENDANTS' BREACHES OF THEIR FIDUCIARY DUTIES

114.   On November 29, 2010, the Kerrisdale Report was issued revealing, among other things: (a) that CEU's SAIC filings for 2006 through 2008 showed merely a fraction of the revenue and profits as compared to CEU's SEC filings; (b) that CEU's Online Segment which accounted for over 60% revenue could not have possibly generated the tens of millions of dollars CEU claimed in its SEC filings as CEU's principal revenue generating website did not function properly and internet usage sites showed very little to no traffic to the site; (c) that the Training Center Building responsible for nearly a quarter of CEU's revenue was an empty building with no classrooms; and (d) that there are several other red flags of fraud, i.e. high CFO turnover, and low quality auditors.

115.   The Kerrisdale Report shocked the market, and caused CEU's stock to fall on November 29, 2010 from a prior closing price of $4.41 per share to $2.93 per share, or 33.5%; and caused an additional $.23 per share or 7.9% drop on November 30, 2010.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

116.   On December 7, 2010, CEU through Yu, with Pan translating, held a conference call with investors reading prepared questions and answers to investors. CEU admitted that its SAIC filings did not match the Company's corresponding SEC filings.

117.   While Yu and Pan provided a number of false reassurances and excuses for this and the many other findings of the Kerrisdale Report as set forth above, shareholders were not satisfied with Yu and Pan's questionable responses.

118.   In fact, following the conference on call, that same day Kerrisdale issued a response to CEU's conference call and announced it stood by its findings. The response states:

**UPDATE – December 7, 2010**

China Education Alliance hosted a conference call this morning to address investor concerns. We believe that the call was essentially 45 minutes of false information and misleading statements. We'll review the call and the new information provided on the company's websites, and determine whether a response is necessary at a later date.

For now, we'll make two points. First, the CFO stated at a conference presentation in November that the company's Heilongjiang Zhonghe Education Training Center is fully operational, provides IT training, is highly profitable, and has been at the same location since 2005. We have video footage of the CFO's statement and will make that available if necessary. This previous statement made during the November conference conflicts with the CFO's new claim that the center is being "re-modeled" for a new school for the arts. Second, we had multiple investigators examine the company's websites from

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

inside Harbin, as opposed to only the United States. For instance, this report[12] from one of our investigators was done from inside Harbin.

We fully stand by our report and our claim that China Education Alliance is mostly a hoax.

119.   The adverse disclosures on the December 7, 2010 conference call caused CEU stock to fall from a prior closing price of $3.25 per share to $2.34 per share or 28%.

### DEFENDANTS' BREACHED THEIR FIDUCIARY DUTIES

120.   As alleged herein, Defendants have breached their fiduciary duties in that Defendants either: (i) knowingly and substantially participated or acquiesced in the issuance of public documents and statements issued or disseminated in the name of the Company (or in their own name) that were materially false and misleading; and/or (ii) have failed to remedy such offenses by commencing a derivative action on behalf of the Company or by demanding the disgorgement of improperly derived profits.

121.   Defendants failed to disclose the truth regarding CEU's financial condition. As a result, CEU's reported financial results were materially false and misleading.

---

[12]   The   hyperlink   is:   http://kerrisdalecap.com/wp-content/uploads/2010/11/Debit-Cards-Reports.pdf

## Issuance of Misleading Statements

122.  The statements detailed above were inaccurate and misleading, contained untrue statements of material facts, omitted facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.  Individual Defendants, by virtue of their control over and/or receipt of information reflecting the true facts regarding CEU, either caused the issuance of the materially misleading statements or failed to timely correct such statements.  These Defendants each had a duty to ensure that such statements were accurate and contained all facts required to be stated therein, and that there were no omissions of material facts that would make the statements misleading.  In the exercise of reasonable care, the Individual Defendants should have known of the material misstatements contained in the Company's press releases, SEC filings, and in statements made by Defendants Yu and Pan and also should have known of the omissions of material facts that were necessary to make the statements made therein not misleading.  As such, the Individual Defendants breached their fiduciary duties.

## Failure to Remedy

123.  Individual Defendants have further breached their fiduciary duties by failing to remedy the acts alleged herein.  Indeed, the current Board has failed to

commence derivative proceedings against any officer and/or director for their breaches of fiduciary duties despite the overwhelming evidence of such breaches. Defendants' failure to remedy the aforementioned offenses is an effective ratification of the wrongdoing and constitutes a breach of the Defendants' fiduciary duties.

## DEMAND REFUSED ALLEGATIONS

124.   Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and other violations of the law.

125.   Plaintiff is an owner of CEU common stock and was an owner of CEU common stock at times relevant hereto.

126. Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

127.   On July 11, 2011, Plaintiff made a demand on the Board to fully investigate and remedy, *inter alia*, breaches of fiduciary duty by certain current and/or former officers, directors and management of the Company (the "Demand").

128.  To date, the Board has not responded to the Demand, nor has any other representative of the Company or its Board.  However, the Company and its Board have clearly received the Demand as evidenced by the attached letter and certified mail return receipt.  *See* Exhibit 2.

54

129.   In light of the Board's utter and complete failure to investigate Plaintiff's Demand or take any action against the Individual Defendants, the Board has demonstrated that it is unable or unwilling to act in good faith with regard to the claims asserted herein. The refusal to substantively respond to Plaintiff's Demand and/or enact corrective measures evidences a lack of good faith exercise of the Board's business judgment.

## FIRST CAUSE OF ACTION

### Against Individual Defendants for Breach of Fiduciary Duty

130.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

131.   The Individual Defendants owed and owe CEU fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe CEU the highest obligation of good faith, fair dealing, loyalty and due care.

132.   Each of the Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

133.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the condition of the Company and failed to correct the Company's public issuances.  Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to

55

ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and/or omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of CEU's securities.

134. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

135. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, CEU has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

136. Plaintiff, on behalf of CEU, has no adequate remedy at law.

## SECOND CAUSE OF ACTION

### Against The Individual Defendants for Abuse of Control

137. Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

138. The Individuals Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence CEU, for which they are legally responsible.

139. As a direct and proximate result of the Individual Defendants' abuse of control, CEU has sustained significant damages.

140. As a result of the misconduct alleged herein, the Individual Defendants

56

are liable to the Company.

141.  Plaintiff, on behalf of CEU, has no adequate remedy at law.

## THIRD CAUSE OF ACTION

### Against the Individual Defendants for Gross Mismanagement

142.  Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

143.  By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of CEU in a manner consistent with the operations of a publicly held corporation.

144.  As direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, CEU has sustained significant damages in excess of millions of dollars.

145.  Plaintiff, on behalf of CEU, has no adequate remedy at law.

## FOURTH CAUSE OF ACTION

### Against the Individual Defendants for Unjust Enrichment

146.  Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

147.  By their wrongful acts and omission, the Individual Defendants were unjustly enriched at the expense of and to the detriment of CEU.

57

148. Plaintiff, as shareholder and representative of CEU, seeks restitution from the Individual Defendants, and seeks an order from this Court disgorging all profits, benefits and other compensation obtained by the Individual Defendants, from their wrongful conduct and fiduciary breaches.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment as follows:

A.     Against the Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.     Awarding to CEU restitution from the Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by these Defendants during the Relevant Period;

C.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorney's fees, accountants' and experts' fees, costs, and expenses; and

D.     Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  October 28, 2011                    Respectfully Submitted,

_____
Byron T. Ball
THE BALL LAW FIRM, LLP
10866 Wilshire Blvd., Suite 1400
Los Angeles, CA 90024
Telephone:  (310) 446-6148
Facsimile:  (310) 441-5386
btb@balllawllp.com

FEDERMAN & SHERWOOD
William B. Federman
10205 N. Pennsylvania Ave.
Oklahoma City, OK  73120
Telephone:  (405) 235-1560
Facsimile:  (405) 239-2112
wbf@federmanlaw.com

*Attorneys for Plaintiff*

59

## VERIFICATION

I, _Benjamin L. Padnos_ declare that I have reviewed the Complaint ("Complaint") prepared on behalf of China Education Alliance, Inc. [NYSE: CEU], and I authorize its filing.  I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true.  I further declare that I am a current holder, and have been a holder, of China Education Alliance, Inc. common stock during the relevant time period in which the wrongful conduct alleged and complained of in the Complaint was occurring.

_10 - 24 - 2011_
Date

(Signature of Investor)

# EXHIBIT 1



**Kerrisdale**Capital

November 2010

# China Education Alliance (CEU)

## Table of Contents

INTRODUCTION ................................... 2

THE COMPANY ..................................... 2

WEBSITE USABILITY ........................... 3

WEBSITE TRAFFIC .............................. 5

THE TRAINING FACILITY ............... 11

FINANCIAL COMPARISON .............. 20

THE AIC FILINGS ............................. 21

INTEREST INCOME .......................... 24

AUDITOR TURNOVER ...................... 25

STOCK OFFERING ............................ 26

PROMOTION SICKNESS ................... 27

CONCLUSION .................................... 28

© 2000 Randy Glasbergen.
www.glasbergen.com

SUZY'S LEMONADE

"So far I've made three dollars selling lemonade and $9 million selling stock in my company."

## Summary

In this report, we present compelling evidence that China Education Alliance (CEU) is fabricating its SEC financial statements. We believe that the company's revenue and profit are highly overstated in its SEC filings and that the company is mostly a hoax. Our evidence includes:

- The company's websites do not work, despite the fact that CEU is an online education provider and its websites are the company's main revenue-generating assets. We have recorded three videos here, here and here which show that the main www.edu-chn.com and www.pk1234567.com websites have non-functioning payment methods and are full of broken links and HTML errors.

- The company's websites receive a fraction of the visitor traffic generated by comparable sites such as those operated by China Distance Education Holdings (DL), which reports lower revenue and lower margins than CEU despite having functioning websites, a larger number of web assets, operational payment schemes and no broken links on their sites.

- We hired an investigator to visit the company's training center in Harbin and found it to be barren of desks and teaching equipment. We provide a video where we present a slideshow of the empty building. We also explain why we are confident we visited the correct location.

- The company's local filings to the Chinese government show that the online business generated less than $1 million in revenue in 2008. We provide SAIC filings from 2006, 2007 and 2008, including both original Chinese photocopies as well as English translations.

- The company's financials are not believable when compared to publicly traded comparable companies. The company reports higher margins and revenue growth when compared to DL, CEDU and CAST, despite having a non-functioning website and an empty training center.

- CEU has had 4 low quality, non-reputable auditors since going public in 2004. The company also raised capital in 2009 at an irrationally low valuation without providing a sensible rationale for why the capital was needed.

**Disclaimer: As of the publication date of this report, Kerrisdale Capital and other individuals that contributed research to this report have short positions in and own options on the stock of the company covered herein (China Education Alliance, Inc.) and stand to realize gains in the event that the price of the stock declines. Following publication of the report, the authors and contributors may transact in the securities of the company covered herein. The authors of this report have obtained all information contained herein from sources they believe to be accurate and reliable. However, such information is presented "as is", without warranty of any kind – whether express or implied. The authors of this report make no representation, express or implied, as to the accuracy, timeliness, or completeness of any such information or with regard to the results to be obtained from its use. All expressions of opinion are subject to change without notice, and the authors do not undertake to update or supplement this report or any of the information contained herein.**



## Introduction

It seems like every week another fraud is exposed in China. Time and again, channel checks and due diligence show that certain companies that have become publicly listed in the United States through reverse mergers are worth a small fraction of their current valuations. Six months ago, there were a few analysts and research firms pounding the table to get investors' attention, and they were criticized by long holders as conspiring to make a quick buck by destroying confidence in legitimate companies. What we're finding today is that analysts from all corners of the market are independently drawing the same conclusions. A number of Chinese companies, brought to market through reverse mergers, are stealing funds from U.S. investors through PIPE transactions and unnecessary public offerings. They sell shares at bargain basement prices while evidence accumulates that the companies' financial figures are highly inflated.

In this report, we examine China Education Alliance and provide strong evidence that the company is inflating its financial statements. China Education Alliance (CEU) is an online distributor of educational material with a website that fails to work and receives minimal online traffic, company facilities that are empty and unused, egregious shareholder dilution for no sensible purpose, AIC financial statements that don't match SEC filings, a history of small no-name auditors, and suspiciously unreasonable margins.

Today, CEU trades at a market capitalization of $150 million and its shares are listed on the New York Stock Exchange. In actuality, the stock is worth little more than the $20 million of cash it raised in its 2009 secondary offering, if indeed that cash still resides in the company's bank account.

We will provide evidence throughout this report that CEU is fabricating its SEC financial statements. Its actual revenue and net income is a small percentage of what it reports in its SEC filings.

The company is mostly a hoax.

## The Company

China Education Alliance ("CEU" or the "Company") claims to be a distributor of "online educational resources through the Internet". Its main business is the operation of www.edu-chn.com, which it claims is "a comprehensive education network platform which is based on network video technology and large data sources of elementary education resources". It also claims to provide on-site teaching services at a facility in Harbin and provide vocational services through the website www.360ve.com. The complete list of websites owned by CEU, as determined by their annual report and a visit to their website, are (i) www.edu-chn.com, (ii) www.360ve.com, and (iii) www.pk1234567.com.

The Company went public in December 2004 through a reverse merger with a U.S.-listed legal entity. Since 2004, the company has ostensibly grown revenue from $3.1 million in 2005 to $37.0 million in fiscal year 2009, and net income from $1.7 million in 2005 to $15.2 million in 2009.

**K** Kerrisdale Capital

Below is the company's historical revenue and operating income according to SEC filings.




We will provide evidence that the charts above are fiction.

# Website Usability

First and foremost, the website that comprises CEU's main business is non-functional in numerous ways. An online visitor who reads Chinese can determine this relatively quickly. In this section, we will explain the various ways in which the company's website does not work, but to better communicate the website's non-functional aspects, we have put together the following three videos:

Video – Part 1: Core Website Has Non-Functioning Payment System
Video – Part 2: Further Website Errors and Comparison with a Comparable Website
Video – Part 3: More Broken Links, Irrelevant Content, and a Flaw with CEU's Business Model

We encourage readers to view all three videos, as they provide compelling evidence that the company's websites are not functional and merely a façade.

Our first video introduces the website and demonstrates that visitors **cannot purchase products from the company's website**, despite the fact that CEU is primarily a provider of online education.

Our second video examines the company's online educational game website www.pk1234567.com and demonstrates that **it neither works nor generates revenue through online payment because the payment options for the game are non-functional**. The second video also contrasts www.edu-chn.com with the properly functioning websites of China Distance Education Holdings (DL), and shows how visitors can in fact purchase products from DL's websites, whereas they cannot from CEU's websites.

Our third video shows numerous broken links and faulty html on the edu-chn.com website, as well as examples of inappropriate, irrelevant and outdated content. It also explores a fundamental flaw with CEU's business model: free test papers and examination material are readily available on the web, and it is unclear why students would pay for content, if in fact the site's payment options were to be functional.

Numerous attempts to purchase products online yielded no success. All payment methods on the company's websites led to error messages. We had multiple investigators call the phone

Kerrisdale Capital Management, LLC  |  20 West 55th Street, 6th Floor  |  New York, NY 10019  |  Tel: 212.792.9148  |  Fax: 212.584.8942

3



numbers on the websites to try to purchase products. The numbers either led to recorded messages during business hours or the callers were told that the cards "could only be purchased on site in Heilongjiang". On several calls, the operators answering the phones were not able to provide any information on where these sites were located, although one operator said that cards are "sold at book stores around schools in Harbin". The cards could not be purchased over the phone.

Click here for a report from one of our investigators who tried to purchase the company's products online and over the phone. The investigator is a resident of Harbin.

Seeing that it's impossible to purchase access to CEU educational materials via the Internet or by phone, we became skeptical that CEU could have a strong enough presence locally in Harbin to generate the revenue reported to the SEC. We hired an investigator to visit bookstores near schools in Harbin to search for these debit cards. Our investigator visited fifteen locations, none of which carried CEU learning cards. Of the fifteen bookstores visited, only two sold learning cards, and neither was for edu-chn.com. One was for a competitor we were not familiar with, www.taiqiedu.com, and the other one was for websites of DL. The other thirteen bookstores did not sell learning cards at all. The addresses and a picture of each visited bookstore can be seen in the PDF linked to below. Our full set of pictures of the bookstores are available at this Flickr account. As a result of our investigation, we do not believe that CEU has a strong enough presence either online or locally in Harbin to generate even a fraction of the revenue reported to the SEC.

Click here for the bookstore addresses and pictures.

To summarize, our investigators could not purchase learning cards on the Internet, over the phone, or in person. Even two independently operating investigators who live in Harbin could not purchase access to CEU course materials. The same is true for pk1234567.com.

These additional errors were encountered while trying to navigate edu-chn.com:
- The "Famed Instructors Test Paper Store" and the "Famous Schools' Test Paper Store" could not be accessed due to an error screen.
- The online store (www.edu-chn.com/wssc/index.htm), which appears to sell merchandise unrelated to education, also does not work.
- The "Big Classroom of Famous Instructors" did not provide access to tutoring services. After viewing a profile, there is a link providing the company's main phone line and a QQ messaging link that doesn't work. The phone number supplied frequently goes unanswered during normal business hours from calls originated in China.
- Some free test material was available for download, but it frequently didn't include answers to sample questions and/or was available on other sites free of formatting issues, leading us to believe that CEU is not the original creator of its free material.
- The websites featured irrelevant content – in our third video, we show that the website includes a personals ad by a 52-year old female seeking a husband.
- Web pages had stale content that have not been updated since late 2005.

We also question how CEU manages to generate any revenue of significance from selling test papers, given the amount of free content available on various other websites and forums that students and parents can easily access. An example was provided in the third video. For instance, http://sj.smez.net allows registered users to download and access an extensive

Kerrisdale Capital Management, LLC | 20 West 55th Street, 6th Floor | New York, NY 10019 | Tel: 212.792.9148 | Fax: 212.584.8942

4



database of test papers for free. Parents and students should have little incentive to pay for such test papers from CEU.

We also compared the CEU websites to sites operated by comparable companies. We looked at China Distance Education Holding's chinaacc.com and med66.com, as well as ChinaEdu Corporation's prcedu.com and chinaedu.com. Please see our investigator's report on these comparable websites here. Across the board, these comparable sites did require learning cards but had smooth purchasing processes with online payment available. Phoning the company was not necessary to acquire the learning cards, and there were no error screens. Most importantly, **_we were able to purchase material from every comparable website without a problem, whereas we could not purchase material from any CEU website or by phone_**.

Additionally, the layout of every site we looked at was more intuitive to use than edu-chn.com.

Despite all of the website shortcomings we detail in this section and in our video, CEU doesn't seem to be suffering financially, if investors are to believe the company's SEC filings. We're confident that those SEC filings are fiction.

In addition to the work that we did ourselves and show in our video, we hired several investigators to put together reports on China Education Alliance's websites, as well as comparable websites. They are here:

Click here for Report on Learning Cards from Investigator 1
Click here for Website Report from Investigator 2
Click here for Comparable Websites Report from Investigator 2

## Website Traffic

A variety of online services monitor visitor traffic to websites and make that information available to the general public. We examined traffic reports from the most popular of these services, Alexa.com, as well as one of the most useful traffic information resources in China, chinarank.org.cn.

Both sites demonstrated low traffic to CEU's websites. When we compared CEU websites to websites operated by DL and CEDU, we found **CEU generates a tiny fraction of its competitors' traffic, yet reports similar revenue**. This is another sign of fraud, consistent with our other findings.

The first screenshot we will show presents the Chinarank data on www.edu-chn.com. Chinarank's page is in Chinese, but we have pasted below a screenshot of Google's English translation of the Chinarank results:

Kerrisdale Capital Management, LLC | 20 West 55th Street, 6th Floor | New York, NY 10019 | Tel: 212.792.9148 | Fax: 212.584.8942

5

KerrisdaleCapital



| | Current | Average week | March Average |
|---|---|---|---|
| Ranking | 45860 | 48825 | 38519 |
| Unique visitors (people / million) | 5 | 6 | 15 |
| Average page views (pages / person) | 1.5 | 1.2 | 1.5 |

We see that data exists for edu-chn.com. We can also compare unique visitor data for this website to other CEU sites:



| Website | Current | 7 Average | Average of 90 days |
|---|---|---|---|
| www.edu-chn.com | 5 | 6 | 15 |
| www.360ve.com | 1 | 1 | 1 |
| www.pk1234567.com | 1 | 1 | 1 |

Kerrisdale Capital Management, LLC  |  20 West 55th Street, 6th Floor  |  New York, NY 10019  |  Tel: 212.792.9148  |  Fax: 212.584.8942

6



What we see above is that edu-chn.com is either the only site that receives traffic or the only site for which data exists. This is not encouraging. While management claims that edu-chn.com is the main web property, we would expect to see some traffic from the others.

Next, we can compare edu-chn.com to some of the sites run by competitors. We'll start with those for China Distance Education Holdings (DL):



| Website | Current | 7 Average | Average of 90 days |
|---|---|---|---|
| www.edu-chn.com | 5 | 6 | 15 |
| www.chinaacc.com | 1394 | 1523 | 1207 |
| www.med66.com | 563 | 586 | 513 |
| www.chinalawedu.com | 20 | 106 | 146 |
| www.zikao365.com | 187 | 224 | 137 |
| www.g12e.com | 53 | 55 | 35 |

Now things get interesting. In the above graph, we see edu-chn.com in dark blue, barely even registering on the chart. If we added all of the DL web properties together, the comparison would be even more appalling. **For reference, according to SEC filings, DL generated $35 million of revenue in the last twelve months compared to $44 million for CEU, despite CEU's websites generating less than one one-hundredth the traffic of DL's websites.** Based on these charts, we cannot understand how this is possible.

Kerrisdale Capital Management, LLC  |  20 West 55th Street, 6th Floor  |  New York, NY 10019  |  Tel: 212.792.9148  |  Fax: 212.584.8942

7



CEU compares similarly to the multiple web properties owned by ChinaEdu Corporation (CEDU):



Again, edu-chn.com is in dark blue, and it's barely perceptible along the bottom of the chart. CEDU generated $58 million of revenue in the last twelve months.

Data offered by Alexa is no better than that offered by chinarank.org.cn. While the data is different, the picture it paints is equally damning. For starters, we'll look at the data provided by Alexa for the three main CEU websites. Again, we see that only edu-chn.com generates any meaningful volume.

Kerrisdale Capital Management, LLC  |  20 West 55th Street, 6th Floor  |  New York, NY 10019  |  Tel: 212.792.9148  |  Fax: 212.584.8942

8

KerrisdaleCapital



Pk1234567.com and 360ve.com hardly register on the chart. Also surprising is the growth pattern of edu-chn.com. In the chart, we see a large jump in traffic in the first quarter of 2010. Yet edu-chn.com was supposedly operational well before 2010. Alexa data is frequently criticized for being easily manipulated. If one believes that Alexa data is easily manipulated, this looks like an egregious example of it. It's not as if edu-chn.com had been unranked prior to 2010, and then appeared on the chart because it was newly recognized by the database. We can see blips on the "Daily Pageviews" chart throughout 2009. Its 2009 traffic was clearly being recorded by Alexa.

We would not be surprised if CEU management began employing data manipulation practices in early 2010 after investors began inquiring about CEU's suspiciously low web traffic figures.

Despite potential manipulation, edu-chn.com again looks like a 2nd tier property when compared to DL. The chart below demonstrates that CEU is generating far less traffic than the combined DL web properties:

Kerrisdale Capital Management, LLC  |  20 West 55th Street, 6th Floor  |  New York, NY 10019  |  Tel: 212.792.9148  |  Fax: 212.584.8942

9





The edu-chn.com website compares more favorably against CEDU's websites in periods after the first quarter of 2010. But again, we believe that the company's Alexa traffic for 2010 has been artificially inflated through various traffic-inflation methods. In prior periods, CEU's website shows far less traffic than CEDU's sites.



Kerrisdale Capital Management, LLC  |  20 West 55th Street, 6th Floor  |  New York, NY 10019  |  Tel: 212.792.9148  |  Fax: 212.584.8942

10



# The Training Facility

The Heilongjiang Zhonghe Education Training Center is located at Building 39, High & New Technology Developing Zone, Sidao Street, Qianshan Road, Nangang District, Harbin, Postcode: 150080. This information can be found in exhibit 10.4 in the 10KSB filed in 2006.

The company has not moved its location since 2006. Here is disclosure from its 2006, 2007, 2008 and 2009 10Ks about the training center. As we can see, the company has described the training center as having "17 modern classrooms that has a capacity for 1,200 students" since its inception, and refers to it by the name "Heilongjiang Zhonghe Education Training Center". Throughout SEC filings and in MD&A, the company consistently refers to a single training center that began operations in 2006.

According to documents filed with the SEC, in 2009 this 36,600 square foot facility generated $12.1 million of revenue at a 78.8% gross margin. Management, however, has claimed in conferences that this facility is only responsible for approximately 60% of segment revenue, with the other 40% coming from smaller satellite facilities. These claims conflict with disclosures in SEC filings, but even if we assume that only 60% of the segment's revenue comes from the Heilongjiang Zhonghe Education Training Center, that's gross income of $156 per square foot. Average rent for Class A office space in Manhattan is $71 per square foot per year. This amazing profitability is something we needed to understand better, so we hired an investigator to visit the school. We found that if CEU is able to generate $156 per square foot, they apparently don't even need furniture to do it.

Our investigator took more than 45 photos, as well as video footage. ***What we found was a vacant, unfurnished building, with little sign of use.*** We have created a video that features our investigator's photos and video footage, as well as general evidence for why the company's training center is a façade.

Click here for our video on the training facility

The building is located inside an industrial park in Harbin. We have listed the English address above, and when translated into Chinese, it's:

哈尔滨，南岗区，千山路，四道街，高新技术开发区，39号楼，邮政编码150080

A Google Maps search for "Heilongjiang Zhonghe Education Training Center" directs us to the page shown below:

Kerrisdale Capital Management, LLC  |  20 West 55th Street, 6th Floor  |  New York, NY 10019  |  Tel: 212.792.9148  |  Fax: 212.584.8942

11





The above location is from Google Satellite. Here is a Google Maps depiction showing the relevant cross streets of the training center.





As we can see, the location of the listed center is on Qianshan Road, matching what the company reported in its SEC filings. Note that Google Maps is providing the specific address of the building, while the SEC disclosure referred to the building's location within the industrial park.

Below is an enlarged picture of the building's front in Google Maps, which matches pictures taken by our investigator (but which was clearly taken at a different time):



Kerrisdale Capital Management, LLC  |  20 West 55th Street, 6th Floor  |  New York, NY 10019  |  Tel: 212.792.9148  |  Fax: 212.584.8942

13



Compare this to the building front taken by our investigator:



It is the same building. We're confident that we have the correct location, and would welcome the company to provide us another "Building 39, High & New Technology Developing Zone, Sidao Street, Qianshan Road, Nangang District, Harbin, Postcode 150080".



Here is an on-site map of the High & New Technology Developing Zone:



The title of the map is 哈尔滨高新区南岗集中区平面图, which translates to "Layout of High & New Technology Developing Zone, Nangang District, Harbin". We have circled building #39.

Here is a closeup of the address:



Kerrisdale Capital Management, LLC  |  20 West 55th Street, 6th Floor  |  New York, NY 10019  |  Tel: 212.792.9148  |  Fax: 212.584.8942

15



The address sign says: 哈高新开发区，39号楼. In English, that translates to "Harbin High & New Technology Zone, Building No. 39".

The building appears to be six stories, based on views of the building from the outside. The floor plans are similar for all the floors, and this is our investigator's rendition of the layout for each floor.



Some of the space is occupied by offices, though most of the space is completely empty. In our <u>video</u>, you can see just how empty the building is. Our full set of pictures is available on Flickr at this <u>link</u>.

Kerrisdale Capital Management, LLC  |  20 West 55th Street, 6th Floor  |  New York, NY 10019  |  Tel: 212.792.9148  |  Fax: 212.584.8942

16



Floor 1:



Floor 2:



Kerrisdale Capital Management, LLC  |  20 West 55th Street, 6th Floor  |  New York, NY 10019  |  Tel: 212.792.9148  |  Fax: 212.584.8942

17



Floor 3:



Floor 4:





Floor 5:



Floor 6:



Kerrisdale Capital Management, LLC  |  20 West 55th Street, 6th Floor  |  New York, NY 10019  |  Tel: 212.792.9148  |  Fax: 212.584.8942

19



As our pictures and video demonstrate, the Heilongjiang Zhonghe Education Training Center is an empty, unfurnished and unused building. The company has not made any disclosures that it has moved into a new facility, and its most recent quarterly report implies that the training center is fully operating. In conferences and investor discussions, the chief financial officer has stated that the training center remains at the same location as the one originally set up in 2005. He has said that it is highly profitable and operating at full capacity. We believe this to be false.

## Financial Comparison

Given the faulty website and the empty training facility, it remains impossible for us to understand how this business generates the same revenue, better margins, and higher earnings than its competitors with functional websites, national scopes, and utilized training facilities. We compared CEU to DL, CEDU, and ChinaCast Education Corporation (CAST). We chose not to look at New Oriental Education & Technology Group (EDU) because we believe it is a fundamentally different business with a larger scale, but we do note that it has much lower margins than CEU. We also include the numbers for the Princeton Review (REVU), a popular US test-prep company with which US investors should be familiar. Its use as a comparison company may be limited, but we will let readers weigh the evidence on their own.

We'll start by showing readers the numbers as of June 30, 2010, and then we'll discuss some of the differences between CEU and its competitors.

*(units: $US in millions)*

| Company | CEU | DL | CEDU | CAST | REVU |
|---|---|---|---|---|---|
| Revenue | $ 40.1 | $ 33.6 | $ 54.7 | $ 60.7 | $ 186.6 |
| Gross Margin | 82.0% | 53.1% | 62.7% | 54.5% | 62.8% |
| EBIT Margin | 44.1% | 4.4% | 23.6% | 36.8% | -13.3% |

CEU – Manages the websites discussed above, with a supposed regional focus in Harbin, the greater Heilongjiang area, and the surrounding provinces. The distribution of online materials accounted for $22 million of revenue in 2009 at a 79% gross margin. A 36,600 square foot facility with 17 classrooms also contributed $12 million of revenue at a 79% gross margin.

DL – Manages a total of 14 websites "each dedicated to a specific industry, profession, or subject area, and accessible from our portal website". In 2009, DL reported 1,071,000 enrollments. This compares to the 600,000 students CEU reportedly served as per its August 2010 investor presentation. Online education courses accounted for 74.0% of revenues in 2009, with the rest coming from the sales of books and reference materials and, to a lesser extent, offline courses.

CEDU – Manages online degree programs (80% of revenue), online tutoring (6%), private schools (9%), and an international curriculum (5%). The business model revolves around partnering with universities to provide online degrees, recruitment services, and student services. The online tutoring program for K-12 students is proclaimed to be China's largest, with 500 branches in 30 provinces, but only 50,000 paying students. The private schools include two completed facilities enrolling a combined 4,900 students. Given that CEDU's private schools generate revenue of $4.9 million, it is difficult to understand how the Harbin training facility with 17 classrooms run by CEU could generate $12.1 million. This is particularly the case in light of our visit to the training facility, which was barren of desks and furniture.



CAST – A post-secondary education company managing three private universities with 30,000 students and 6.5 million square feet of space generating $32 million of revenue. It also provides e-learning services to 141,000 students, a teacher training program, and a vocational network generating $29 million of revenue.

REVU – Most U.S. citizens are likely familiar with the Princeton Review. REVU also owns Penn Foster which provides online degree, diploma, and certificate programs to 207,000 students in vocational, college, and high school programs. The traditional Princeton Review is only responsible for $111 million of revenue. Knowing how popular these courses are in the U.S., and knowing how much they cost, we have a lot of trouble believing that a non-functional K-12 website targeting students in a handful of Chinese provinces could generate $22 million. We also have trouble believing the growth numbers.

## The AIC Filings

CEU's locally filed financial statements in China do not match its SEC financial statements. These local financial statements, which CEU must file with the Harbin branch of the Administration for Industry and Commerce ("AIC"), show that the online business generated revenue of less than $1 million in 2008. This corroborates our belief that CEU is mostly a hoax. We believe that the company is providing accurate financial statements to its own government, but is providing fraudulent numbers to U.S. investors and the U.S. Securities and Exchange Commission. 2008 was the most recent year for which we could access filings, as of our last inquiry on November 15.

Below are photocopies of the company's AIC filings for 2008, 2007 and 2006 for CEU's main operational subsidiary, Harbin Zhong He Li Da Education Technology, Inc. We provide filings in their original Chinese, as well as English translations of those filings.

AIC Reports:
2008 AIC Filings in Original Chinese
2008 AIC Filings in English Translation
2007 AIC Filings in Original Chinese
2007 AIC Filings in English Translation
2006 AIC Filings in Original Chinese
2006 AIC Filings in English Translation

For those new to the U.S.-listed Chinese reverse merger space, all Chinese companies are required to file financial statements with the Chinese government. Specifically, they must file financial statements with their local branch of the State Administration for Industry and Commerce ("SAIC"). The SAIC is the Chinese government body that regulates industry and commerce in China. Its provisions are executed by local county branches.

Information filed with AIC branches includes organizational bylaws/minutes; capital infusion/withdrawal data; the approved business description; information on business licenses; land use rights; property leases; applications to form companies, with personal information on the applying shareholders; the legal representatives; tax data; and annual financial statements.

Kerrisdale Capital Management, LLC  |  20 West 55th Street, 6th Floor  |  New York, NY 10019  |  Tel: 212.792.9148  |  Fax: 212.584.8942

21



Below, we have pasted the organizational structure for CEU as of 12-31-09. The same organizational structure can be found in the company's 2009 10K here, and we have rearranged it so it can be legibly shown below in our report.

**China Education Alliance Legal Organizational Structure**

```
┌───────────────────────────┐        70%        ┌───────────────────────────┐
│ China Education Alliance Inc. │───────────────│   World Exchange Inc.    │
└───────────────────────────┘                   └───────────────────────────┘
Foreign  ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─
PRC
┌───────────────────────────┐                   ┌───────────────────────────┐
│   Harbin Zhong He Li Da    │                   │  Beijing Wei Shi Yi Tong   │
│ Education Technology, Inc. │                   │ Education Technology Co. Inc. │
└───────────────────────────┘                   └───────────────────────────┘

        100%   ┌──────────────────────────────┐
               │ Heilongjiang Zhonghe Education │
               │        Training Center         │
               └──────────────────────────────┘
        70%    ┌──────────────────────────────┐
               │   Beijing Hua Yu Hui Zhong     │
               │ Technology Development Cop. Ltd. │
               └──────────────────────────────┘
        49%    ┌──────────────────────────────┐
               │     Harbin New Discovery       │
               │          Media Co.             │
               └──────────────────────────────┘
        85%    ┌──────────────────────────────┐
               │    Zhong He Li Da (Beijing)    │
               │  Management Consultant Co. Ltd │
               └──────────────────────────────┘
        65%    ┌──────────────────────────────┐
               │  Beijing New Shifan Education & │
               │       Technology Co. Ltd       │
               └──────────────────────────────┘
```

Chinese GAAP does not consolidate subsidiaries, and it is therefore important for us to explain why we only use the AIC filings of Harbin Zhong He Li Da Education Technology, Inc. ("ZHLD") to demonstrate that the company's AIC filings show a business far smaller than what SEC financials indicate.

Harbin Zhong He Li Da Education Technology, Inc. generates more than 65% of CEU's revenue and gross profit according to SEC filings. The Heilongjiang Zhonghe Education Training Center generates 30% of revenue and gross profit according to SEC filings. The remaining subsidiaries generate minimal revenue and can be ignored. We provide reasons below:



| Name of Subsidiaries | Rationale for Why Subsidiar(ies) Are Not Material |
|---|---|
| *World Exchange Inc. and Beijing Wei Shi Yi Tong Education Technology Co. Inc.* | These two subsidiaries have not been consolidated into 2009 SEC financial statements because the acquisition was cancelled on September 20, 2010 and 400,000 shares were returned to CEU for cancellation. |
| *Beijing Hua Yu Hui Zhong Technology Development Co., Ltd (BHYHZ).* | Formed on September 30, 2006 and then transferred in part (30%) to the National Vocational Education Association of China for no consideration. It provides information regarding vocation training schools. The language in SEC filings describing this segment implies that it is not yet fully established – the company says that "we are in the process of introducing new services…" and "the core business for our vocation education will be in three main areas…" |
| *Harbin New Discovery Media Co.* | This is a joint venture entered into with the Harbin Daily Newspaper Group on April 18, 2008, in which ZHLD contributed $430k and the newspaper group contributed $445k. This segment publishes a scientific newspaper. It's likely too small to generate meaningful revenue for CEU. |
| *Zhong He Li Da (Beijing) Management Consultant Co., Ltd.* | This is a joint venture entered into with Mr. Guang Li on January 4, 2009, in which ZHLD contributed $62,107 and Li contributed $10,960. According to SEC filings, this subsidiary "will be involved in the vocational training business, [and] in particular, in running the 'Million Managers Training Program'." It's likely not yet a material revenue contributor. |
| *Beijing New Shifan Education & Technology* | Incorporated in February 2010, this subsidiary acquired assets of another company for RMB 6 million (approx. $900k). It publishes a magazine and manages a nationwide contest. |

Interestingly, the only website which we found to be reasonably functional, www.360ve.com, is admittedly not generating any earnings.

We can conclude that the main revenue-generating subsidiaries are (i) Harbin Zhong He Li Da Education Technology, Inc. and (ii) Heilongjiang Zhonghe Education Training Center. The training center presumably generates the training center-related revenue and profit, while Harbin Zhong He Li Da Education Technology, Inc. generates the remaining revenue and profit.

According to SEC filings, the "Online Education" segment generated $22.2 million at 79.4% gross margins; "Training Center" generated $12.1 million of revenue in 2009 at 78.8% gross margins; and "Advertising Revenue" accounted for $2.6 million at 92.0% gross margins. For 2008, "Online Education" generated $16.7 million at 82.9% gross margins; "Training Center" generated $5.6 million of revenue at 65.4% gross margins; and "Advertising Revenue" accounted for $2.6 million at 93.0% gross margins.

Kerrisdale Capital Management, LLC  |  20 West 55th Street, 6th Floor  |  New York, NY 10019  |  Tel: 212.792.9148  |  Fax: 212.584.8942

23



Therefore, we should expect the 2008 AIC filings of Harbin Zhong He Li Da Education Technology, Inc. to show at least $16 million of revenue and $13 million of gross profit.

What we find is quite different. We have provided the original and translated AIC filings at the beginning of this section. A comparison of SEC and AIC financial figures is below:

**A Comparison of SEC and SAIC Filings for China Education Alliance**

*(Units are in dollars, using average annual RMB/USD exchange rates)*

| From SEC Filings | 2006 | 2007 | 2008 |
|---|---|---|---|
| Revenue (excluding training center) | $6,620,519 | $13,623,707 | $19,298,048 |
| Gross Profit (excluding training center) | $4,854,077 | $11,229,762 | $16,255,950 |
| | | | |
| Total Revenue | $8,324,473 | $17,323,534 | $24,851,017 |
| Total Gross Profit | $5,760,583 | $13,782,225 | $19,886,078 |
| Total Net Income | $2,624,660 | $3,104,907 | $9,918,536 |
| Total Assets | $9,277,646 | $20,310,653 | $35,741,915 |

| From AIC Filings | 2006 | 2007 | 2008 |
|---|---|---|---|
| Revenue | $54,500 | $23,598 | $612,869 |
| Gross Profit | -$7,959 | -$106,712 | $495,235 |
| Income from Operations | -$107,131 | -$423,788 | -$69,010 |
| Net Income | -$144,572 | -$415,926 | $17,340 |
| Total Assets | $1,447,938 | $2,256,720 | $4,038,409 |

We believe that the AIC filings, which represent the financial information that management submits annually to its own government, demonstrate the real revenue at the main operational subsidiary of China Education Alliance. This real revenue for 2008 was less than $1 million.

# Interest Income

As distorted as the income statement is, the balance sheet is just as bad. It presents another red flag that emerges in many fraudulent U.S.-listed Chinese companies. Despite large purported cash balances, frauds routinely report miniscule interest income. From December 31, 2009 to June 30, 2010, CEU grew its cash balance from $65 million to $76 million. However, over the same six month period, CEU only generated interest income of $97,535. Annualized, that's interest income of only 0.28%. Over the 12 months ended June 30, 2010, CEU had an average cash balance of $53 million, from which the company earned just $180,000, or 0.34%.

We are faced with two scenarios: management either eagerly diluted shareholders only to hold the newly raised cash in non-interest bearing accounts, or is fabricating the $76 million balance. We're confident that the second scenario is true. The $76 million of cash reported in the company's SEC filings is fiction.



Comparing the CEU cash yield to comparable companies' makes the problem a little more obvious:

| Company | CEU | DL | CEDU | CAST | REVU |
|---|---|---|---|---|---|
| Cash & Equivalents | $ 74.7 | $ 46.8 | $ 49.1 | $ 156.9 | $ 12.1 |
| Interest Yield | 0.2% | 0.9% | 1.4% | 0.9% | 0.1% |

In the table above, we used the cash balance as of June 30, 2010 and the interest income during the twelve months ended June 30, 2010.

## Low Quality Auditors & High Auditor / CFO Turnover

Low quality auditors and high auditor turnover are telltale signs of trouble. Repeated changes in auditors should be looked at with suspicion, especially considering all of the other red flags that we have identified in this report.

Here is a chart documenting the company's history of auditors:

| Date | Name | Comments |
|---|---|---|
| *2009-Present*: | Sherb & Co. | Last PCAOB audit was in 2007 and showed 6 partners, 17 staff members, and 73 issuer clients |
| *2006-2008*: | Murrell, Hall, McIntosh & Co. | Last PCAOB audit was in 2006 and showed 9 partners, 45 staff members, and 16 issuer clients |
| *2005*: | e-Fang Accountancy Corp. | Last PCAOB audit was in 2010 and showed 2 partners, 3 staff members, and no issuer clients |
| *2004*: | Jimmy C.H. Cheung & Co. | Last PCAOB audit was in 2009 and showed 1 partner, 26 staff members, and 8 issuer clients |

None of the above auditors are considered top 100 accounting firms, and all are small, non-reputable firms. CEU's longest auditor relationship lasted 3 years. Why would management need a new accounting firm of subpar quality every few years?

Kerrisdale Capital Management, LLC  |  20 West 55th Street, 6th Floor  |  New York, NY 10019  |  Tel: 212.792.9148  |  Fax: 212.584.8942

25



Below is a table outlining the company's history of chief financial officers:

| Date | Name | Comments |
|------|------|----------|
| *August 2009 - Present*: | Zibing Pan | Previous experience as audit manager at EideBailly. Pan is a CPA and has an MBA from the University of Central Oklahoma. |
| *June 2008 - August 2009*: | Susan Liu | Previous experience as CFO at Entech Environmental (now SkyPeople Fruit Juice, trades at 5x earnings) for less than a year and Hendrx Corp (shares traded over $5 in 2005, now at less than $0.01) for less than a year. |
| *2004 - June 2008*: | Chunqing Wang | Served as CFO of Harbin Tian Run Group from 1990 through 2004. Was previously a planning department head at the Harbin Bureau of Finance. Graduate in industrial accounting from the Harbin College of Economic Carde Management. |

The qualifications of the current and past chief financial officers do not give investors any further comfort. Another troubling sign is the turnover subsequent to 2008, when the first non-Harbin, or outsider, chief financial officer was hired.

# Stock Offering

Fraudsters don't perpetuate a fraud for fun – they keep the machine running to steal cash in share offerings. This is how frauds make money. At the end of 2008, CEU supposedly had $23 million of cash on its balance sheet. Despite generating $15 million of net income and $19 million operating cash flow in 2009, the company decided to raise an additional $18 million by issuing new shares and an additional $6 million from exercising warrants. The commitment was made on September 29, 2009, to sell 3,162,055 shares at $5.50 per share. The Company received $5.17 per share, after underwriting fees. Compared to earnings per share of $0.63 in 2009, this represented a P/E of 8.2x. The transaction increased the basic share count by 11.7%. On May 12, management stated "We expect 30 percent revenue growth for the full year 2010". This means management raised capital via a secondary offering at a forward 2010 earnings multiple of 6.3x earnings.

Selling shares could be reasonable if management needed the cash to profitably grow the business. But they have neither utilized this capital nor explained how they will do so. The newly raised cash sits in a bank (supposedly), earning minimal interest. As of today, less than $1 million has been spent on a single acquisition, and $3 million has been allocated for 6 new learning centers in Beijing.

Kerrisdale Capital Management, LLC  |  20 West 55th Street, 6th Floor  |  New York, NY 10019  |  Tel: 212.792.9148  |  Fax: 212.584.8942

26



The icing on the cake is that on October 27, 2010, CEU released an amendment to its annual report. One of the key changes was made to the "Liquidity and Capital Resources" section, which has been changed to read as follows (emphasis added):

> During the next five years, we may incur substantial expenditure for acquisitions and the setup of new schools and training centers in new markets. During this five year expansion period we may require additional funding for the expansion purpose. At this time we are unable to accurately project the funding needs beyond the next twelve months since long-term needs depend on the availability and the scale of acquisitions we might make. The anticipated cost for the future expansion may also associate with the development of a nation-wide advertising campaign, which is estimated to be approximately additional 5% of our total revenue. **If additional funds are needed in the future we anticipate obtaining such funds through the sale of equity.**

To repeat: this is how frauds steal money from foreign investors and this is why management continues to perpetuate the fraud.

## Promotion Sickness

As a final point, we would like to highlight CEU's aggressive marketing campaign in 2010, as disclosed by press releases from the company denoting conferences that CEU has attended in the past year. This is not evidence for fraud, but worth looking at for anyone who is interested in understanding how these frauds operate. Since the start of 2010, CEU has participated in the following conferences:

- November 2010 – New York - Brean Murray, Carret & Co. 2010 China Growth Conference
- September 2010 – New York - Rodman & Renshaw Annual Investment Conference
- July 2010 – San Francisco - Global Hunter Securities China Conference
- May 2010 – New York - Piper Jaffray China Growth Conference
- April 2010 – RedChip Small-Cap Equities Virtual Conference
- March 2010 – California - 22nd Annual OC Growth Stock Conference
- March 2010 – Beijing - Rodman & Renshaw China Investment Conference
- January 2010 – New York - Cowen & Company 8th Annual Consumer Conference

With a tour like this, there can be little doubt that management is doing all they can to "get the story out". Any institutional asset manager, hedge fund, or investor interested in this space has undoubtedly been exposed to CEU. Yet the stock still trades at less than 10x earnings. It is no coincidence that many institutional investors have decided against investing in CEU's stock. They merely need to hire a Chinese speaker for one hour to investigate the company's website in order to recognize that the company is a fraud.

Kerrisdale Capital Management, LLC  |  20 West 55th Street, 6th Floor  |  New York, NY 10019  |  Tel: 212.792.9148  |  Fax: 212.584.8942

27



# Conclusion

It is difficult to believe that this company is valued at $150 million. It is an even sadder state of affairs that the company is listed on the New York Stock Exchange. There are dozens of red flags, any one of which should scare investors away. To recap, here are glaring issues:

1) The company's main revenue-generating website does not have a functioning payment system. Its online and mobile payment methods lead to error screens. One cannot purchase their products by calling them over the phone. Our investigators could not find their learning cards at any Harbin bookstores, despite visiting 15 locations.

2) The company's sites feature a multitude of error screens, broken links, faulty HTML, irrelevant content and outdated material.

3) The website receives minimal traffic. Data sources show either little volume or suspicious traffic growth, or both.

4) Comparable online education websites in China have properly functioning payment systems, no broken links, and a cleaner and more intuitive layout. Yet investors are to believe that CEU's faulty website with a geographic scope limited to Harbin is generating the same revenue and better margins than functioning websites with a national scope.

5) The training facility is supposedly generating outsize profits and margins, despite the fact that it is empty and unfurnished.

6) AIC financial statements filed in China for the online business (ie. excluding the training center segment) showed revenue of less than $1 million in 2008. We believe that companies report accurate financial figures to their own government, whereas they report fabricated financial figures to the U.S. government and U.S. investors.

7) The company generates suspiciously low interest income off of its ostensibly large cash balance. We believe that most of this cash does not exist.

8) The company has had 4 low-quality auditors in the past 6 years. In contrast, the comparable Chinese education providers DL, CEDU and CAST all have top-4 auditors.

9) The company raised cash at a discount to its stock price at the time of its equity offering and has done nothing with that cash. It already supposedly had $38 million of cash on its balance sheet prior to its unnecessary capital raise.

# EXHIBIT 2

# FEDERMAN & SHERWOOD

### (AN ASSOCIATION OF ATTORNEYS AND PROFESSIONAL CORPORATIONS)

10205 N. PENNSYLVANIA AVENUE
OKLAHOMA CITY, OKLAHOMA 73120
405-235-1560
FACSIMILE: 405-239-2112

**REPLY TO:** OKLAHOMA CITY, OK

2926 MAPLE AVENUE
SUITE 200
DALLAS, TEXAS 75201
214-696-1100
FACSIMILE: 214-740-0112

July 11, 2011

**VIA CERTIFIED MAIL**
Xiqun Yu
China Education Alliance, Inc.
Board of Directors
327 Hillsborough Street,
Raleigh, North Carolina 27603

      Re:       Shareholder Demand on the Board of China Education Alliance, Inc.

Dear Mr. Yu:

This firm represents Benjamin Padnos, a holder of common stock of China Education Alliance, Inc. ("CEU" or the "Company"). I write on behalf of our client to demand that the members of the Board of Directors of CEU (the "Board") take action to remedy breaches of fiduciary duties by certain current and/or former executive officers and directors of the Company, (the "Individuals"), including but not limited to the following: Zibing Pan, Susan Liu, Chunqing Wang, James Hsu, Lianzheng Zhang, Yizhao Zhang and Xiqun Yu.

As you are aware, by reason of their positions as officers and/or directors of CEU and because of their ability to control the business and corporate affairs of CEU, the Individuals owe CEU and its shareholders the fiduciary obligations of good faith, loyalty, and due care and are required to use their utmost ability to control and manage CEU in a fair, just, honest, and equitable manner. Our client believes that the Individuals violated these fundamental fiduciary duty principles by failing to maintain and effectuate necessary internal control such as to ensure accurate financial disclosures.

Specifically, on November 29, 2010, the analyst firm Kerrisdale Capital published as extensive report detailing its findings that CEU's revenue and profits were highly overstated in its SEC filing and terming the Company "mostly a hoax." The Kerrisdale report claimed, among other allegations, that CEU's filings in China show but a fraction of the revenue CEU reported to the SEC and that the allegedly state of the art training center is an empty building with no classrooms. The upshot of these allegations is that the Board failed to establish and maintain an effective system of internal and financial controls for the Company. The Company's financial reports and statements about its future prospects were thus lacking in any reasonable basis when made. As a result of the Kerrisdale report, CEU's stock price fell 44.4% to $2.70 per share.

China Education Alliance, Inc.
Xiqun Yu
Page 2


On December 7, 2010, CEU conducted a conference with investors in an attempt to address the Kerrisdale report issues. While CEU admitted there were severe discrepancies between its Chinese and SEC filings, CEU blamed the discrepancies on the differences in accounting methods between the two countries and claimed that the Chinese filings were customarily inaccurate in order to prevent competition from gaining an advantage. The Company's exculpatory statements were plainly false, causing the stock price to fall an additional 28%.

Based on the foregoing, we demand that the Board appoint an independent committee to commence a reasonable and good faith investigation of: (i) the amount of damages sustained by the Company as a result of the Individuals' breaches of fiduciary duties alleged herein; and (ii) all bonuses, restricted stock, stock options, and other incentive compensation payed to those Individuals. We also demand that, should such a remedy be appropriate, the Board immediately proceed with a civil action against the Individuals and recover for the benefit of the Company any and all appropriate relief. Such action would be in the best interests of the Company. We are willing to participate in and assist the Company with the appointment of an independent committee and its investigation.

If, after receipt of this letter, the Board has not commenced a reasonable and good faith investigation as demanded within ninety (90) days, we will seek to file a derivative action. A timely response from the Board confirming that they have instituted a reasonable and good faith investigation would be appreciated.


Sincerely,

William B. Federman

**SENDER: COMPLETE THIS SECTION**

- ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Xiqun Yu
China Education Alliance, Inc.
Board of Directors
327 Hillsborough St.
Raleigh, NC 27603

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____  ☐ Agent
                                ☐ Addressee

B. Received by ( Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

3. Service Type
   ☑ Certified Mail      ☐ Express Mail
   ☐ Registered          ☑ Return Receipt for Merchandise
   ☐ Insured Mail        ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)          ☐ Yes

2. Article
   (Tran

PS Form ___, ___ary 2004        Domestic Return Receipt        102595-02-M-1540

Name & Address:
Byron T. Ball SBN: 150195
The Ball Law Firm, LLP
10866 Wilshire Blvd. Suite 1400
Los Angeles, CA 90024

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BENJAMIN L. PADNOS, Derivatively on behalf of CHINA EDUCATION ALLIANCE, INC. <br><br> PLAINTIFF(S) <br><br> v. <br><br> XIQUN YU, ZIBING PAN, SUSAN LIU, CHANQING WANG, JAMES HSU, LIANSHEND ZHANG, and YIZHAO ZHANG, Nominal Defendant: CHINA EDUCATION ALLIANCE, INC., A North Carolina Corporation <br> DEFENDANT(S). | CASE NUMBER <br><br> CV11-8973-JAK (PJWx) <br><br><br> SUMMONS |

TO:   DEFENDANT(S): XIQUN YU, ZIBING PAN, SUSAN LIU, CHANQING WANG, JAMES HSU, LIANSHEND ZHANG, and YIZHAO ZHANG

 A lawsuit has been filed against you.

 Within **21** days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, **Byron T. Ball** _____, whose address is **10866 Wilshire Blvd. Suite 1400 Los Angeles, CA 90024** _____.  If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated:  **10 - 28 - 11**

By: _____
 Deputy Clerk

 *(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY**

This case has been assigned to District Judge John Kronstadt and the assigned discovery Magistrate Judge is Patrick J. Walsh.

The case number on all documents filed with the Court should read as follows:

## CV11- 8973 JAK (PJWx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=================================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] **Western Division** | [ ] **Southern Division** | [ ] **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)     NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

I (a) PLAINTIFFS (Check box if you are representing yourself ☐)
BENJAMIN L. PADNOS, Derivatively on Behalf of CHINA EDUCATION
ALLIANCE, INC.

DEFENDANTS
XIQUN YU, ZIBING PAN, SUSAN LIU, CHANGING WANG, JAMES HSU,
LIANSHENG ZHANG, and YIZHAO ZHANG
Nominal Defendant: CHINA EDUCATION ALLIANCE, INC.

(b) Attorneys (Firm Name, Address and Telephone Number. If you are representing
yourself, provide same.)
BYRON T. BALL, THE BALL LAW FIRM LLP
10866 Wilshire Blvd. Suite 1400 Los Angeles, CA 90024 (310) 446-6148

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff     ☐ 3 Federal Question (U.S.
                                       Government Not a Party)

☐ 2 U.S. Government Defendant   ☑ 4 Diversity (Indicate Citizenship
                                       of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☑ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☑ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☑ Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☑ No    ☑ MONEY DEMANDED IN COMPLAINT: $ Greater than $75,000

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 U.S.C Section 1332

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | Vacate Sentence | ☐ 720 Labor/Mgmt. |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | Habeas Corpus | Relations |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | | | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | Disclosure Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 340 Marine | BANKRUPTCY | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 810 Selective Service | | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury- Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 365 Personal Injury- Product Liability | ☐ 443 Housing/Acco- mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | SOCIAL SECURITY |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 893 Environmental Matters | REAL PROPERTY | | | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | IMMIGRATION | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 462 Naturalization Application | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 900 Appeal of Fee Determi- nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | ☐ 463 Habeas Corpus- Alien Detainee | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| | ☐ 240 Torts to Land | ☐ 465 Other Immigration Actions | | | FEDERAL TAX SUITS |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ☐ 290 All Other Real Property | | | | ☐ 871 IRS-Third Party 26 USC 7609 |

FOR OFFICE USE ONLY:   Case Number: **CV11-8973- JAK (PJWx)**

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No ☑ Yes
If yes, list case number(s): 10-09239 CAS (JCx)

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply) ☑ A. Arise from the same or closely related transactions, happenings, or events; or
☑ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☑ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Manhattan Beach | ~~People's Republic of China~~ Los Angeles |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | People's Republic of China |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
   **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | Los Angeles |

* **Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved.

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____ Date October 28, 2011

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |